Steve W. Berman (*pro hac vice*)
Robert F. Lopez (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
robl@hbsslaw.com

Benjamin J. Siegel (SBN 256260)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
bens@hbsslaw.com

Bonny E. Sweeney (SBN 176174)
Samantha J. Stein (SBN 302034)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980
bsweeney@hausfeld.com
sstein@hausfeld.com

Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Alberto Rodriguez (*pro hac vice forthcoming*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile: (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com

*Attorneys for Plaintiffs and the Proposed Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PURE SWEAT BASKETBALL INC., an Illinois corporation, and PEEKYA APP SERVICES, INC. a Florida corporation, on behalf of themselves and all others similarly situated,<br><br>                                   Plaintiffs,<br><br>         v.<br><br>GOOGLE LLC, a Delaware limited liability company; GOOGLE IRELAND LIMITED; GOOGLE COMMERCE LIMITED; GOOGLE ASIA PACIFIC PTE. LTD.; and GOOGLE PAYMENT CORP.,<br><br>                                   Defendants. | Case No. 3:20-cv-05792-JD<br>Case No. 3:20-cv-06772-JD<br><br>**FIRST CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SHERMAN AND CLAYTON ACTS (15 U.S.C. §§ 1, 2, 3, 15, 26), CARTWRIGHT ACT (CAL. BUS. & PROF. CODE §§ 16700 ET SEQ.) AND UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§17200 ET SEQ.)**<br><br>**DEMAND FOR JURY TRIAL OF ALL ISSUES SO TRIABLE** |

**TABLE OF CONTENTS**

<u>Page</u>

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 10

III.    INTRA-DISTRICT ASSIGNMENT ................................................................ 11

IV.     PARTIES ........................................................................................................... 11

        A.      The Plaintiffs ......................................................................................... 11

        B.      The Defendants ...................................................................................... 13

V.      RELEVANT FACTS ......................................................................................... 14

        A.      The Market for Licensable Smart Mobile Operating Systems .............. 14

        B.      The Google Play Store ........................................................................... 20

        C.      While the Android OS is superficially Open-source, Google Maintains
                an Iron grip on its Commercial Aspects. ............................................... 23

        D.      Google is a Monopolist in the U.S. Markets for Android OS App
                Distribution and In-app Payment Processing. ....................................... 28

        E.      Apple Offers No Market Constraints ..................................................... 31

        F.      Google Engages in Unlawful Behavior in Order to Restrain Trade and
                to Maintain and Grow its Monopoly. .................................................... 32

                1.      Google was recently fined over $5 billion for practices related
                        to Google Play. ........................................................................... 33

                2.      Google has used anticompetitive contracts with device
                        manufacturers. ............................................................................ 34

        G.      Google's Practices with Respect to Google Play Further Restrain and
                Injure Competition in the Market for U.S. Android OS App
                Distribution. ........................................................................................... 37

                1.      There are high barriers to entry into the market for Android OS
                        app distribution. ......................................................................... 38

                2.      Google manipulates security fears to maintain and further its
                        market power in U.S. Android OS app distribution. ................... 39

                3.      Google's refusal to permit app-store clients into Google Play
                        means that only a hardy few will attempt installation of
                        alternative stores. ....................................................................... 43

                4.      Even if a consumer succeeds in loading an alternative app-store
                        client onto his or her device, Google may try to shut down
                        access, which harms competition and developers. ..................... 47

        H.      Google's unlawful practices harm developers and competition .............. 49

1        1.     Google's behavior stifles innovation. ...................................................... 49

2        2.     Google harms developers by killing competition and diminishing consumer choice. ............................................................... 53

3        3.     Google also harms developers and competition by depressing output. ..................................................................................................... 53

4        4.     Google harms developers by charging supracompetitive pricing of distribution services for Android OS apps and in-app add-ons, including subscriptions. ......................................................... 54

VI.     INTERSTATE TRADE AND COMMERCE ............................................... 59

VII.    RELEVANT MARKETS ............................................................................. 59

VIII.   CLASS ALLEGATIONS ............................................................................. 65

IX.     APPLICABILITY OF CALIFORNIA LAW ............................................. 68

FIRST CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT –
MONOPOLIZATION OF U.S. ANDROID APP DISTRIBUTION MARKET
(15 U.S.C. § 2) ......................................................................................................... 68

SECOND CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT –
ATTEMPTED MONOPOLIZATION OF U.S. ANDROID APP
DISTRIBUTION MARKET (15 U.S.C. § 2) ............................................................ 70

THIRD CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT -
MONOPOLIZATION OF U.S. MARKET FOR ANDROID IN-APP
PAYMENT PROCESSING SERVICES (15 U.S.C. § 2) ......................................... 72

FOURTH CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT –
ATTEMPTED MONOPOLIZATION OF U.S. MARKET FOR ANDROID
IN-APP PAYMENT PROCESSING SERVICES (15 U.S.C. § 2) ........................... 73

FIFTH CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT –
RESTRAINT OF TRADE RE: IN-APP PAYMENT PROCESSING
(15 U.S.C. §§ 1, 3) .................................................................................................. 74

SIXTH CAUSE OF ACTION: VIOLATION OF THE SHERMAN ACT – TYING
AS ALTERNATIVE BASIS FOR RESTRAINT OF TRADE RE: IN-APP
PAYMENT-PROCESSING (15 U.S.C. §§ 1, 3) ...................................................... 76

SEVENTH CAUSE OF ACTION: VIOLATION OF THE UNFAIR COMPETITION
ACT (CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*) ...................................... 78

EIGHTH CAUSE OF ACTION: VIOLATION OF THE CARTWRIGHT ACT
(CA. BUS & PROF. CODE §§ 16700 *ET SEQ.*) .................................................. 79

PRAYER FOR RELIEF ...................................................................................................... 81

JURY TRIAL DEMANDED .............................................................................................. 82

1      For their suit against Defendants Google LLC, Google Ireland Limited, Google Commerce

2  Limited, Google Asia Pacific PTE. Ltd. and Google Payment Corp. (collectively, Google), Plaintiffs

3  Pure Sweat Basketball Inc. and Peekya App Services, Inc., on their own behalf and that of all

4  similarly situated U.S. Android OS application developers, allege as follows:

## I.    INTRODUCTION

      1.      Native applications—apps of various sorts programmed for and downloaded to a mobile device—bring smartphones and tablets to life. In turn, add-ons for apps—items such as consumables (for example, extra lives in an adventure game), or, *e.g.*, subscriptions for full-fledged mobile productivity apps—make apps more fun or useful. Developers, with their ingenuity, training, investment, and hard work, create these apps and extras. And certainly, there are many device users who buy them. As of June 2019, for example, 81% of Americans owned smartphones, and 52% owned tablets.[1] The two dominant (albeit not mutually competitive) stores—Google Play for Android Operating System (OS) products, and the App Store for Apple iOS products—generate billions of dollars in annual revenue for their owners, Google LLC and Apple Inc., respectively.[2] As the Congressional Subcommittee on Antitrust, Commercial and Administrative Law recently reported, "both Apple and Google have durable and persistent market power in the mobile operating system market; iOS and Android run on more than 99% of mobile devices in the U.S. and globally."[3]

---

[1] http://www.pewinternet.org/fact-sheet/mobile/ (last accessed Aug. 15, 2020).

[2] *See, e.g.*, https://www.statista.com/statistics/296226/annual-apple-app-store-revenue/ ("In the last reported year, customers spent an estimated 54.2 billion U.S. dollars on in-app purchases, subscriptions, and premium apps in the Apple App store. (last accessed Aug. 15, 2020); https://www.statista.com/statistics/444476/google-play-annual-revenue/#:~:text=This%20statistic%20the%20worldwide%20app,spending%20in%20the%20previous%20year. (reporting study indicating that Google Play spending in 2019 was some $29.3 billion, which would translate to roughly $9.76 billion, based on the 30% Google revenue share discussed below) (last accessed Aug. 15, 2020). Alphabet, Google's parent, reported in its 10-K for 2019 that "other revenue," including that generated from Google Play, Google hardware, and YouTube subscriptions, amounted to $17.014 billion for 2019. (https://abc.xyz/investor/static/pdf/20200204_alphabet_10K.pdf?cache= cdd6dbf (Alphabet 2019 10-K at 32) (last accessed Aug. 15, 2020).)

These are global figures. Neither Apple nor Google publishes U.S. figures.

[3] *Investigation of Competition in Digital Markets: Majority Staff Report and Recommendations*, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary,

Furthermore, the Apple App Store is "the only app store available on iOS devices," and the "Google Play store is the primary app store installed on all Android devices."[4] And because apps for iOS and Android devices are incompatible,[5] with all the barriers and switching costs entailed, these two corporate giants, Google and Apple, can split the lucrative mobile apps world neatly between them, with enormous ongoing profits for each.

2.     Because Apple's store operates in its own discrete sphere, it does not place any competitive pressure on Google's store, including as to the prices that Google charges developers for app distribution services. The same is true with respect to in-app services, which primarily entail the processing of consumers' payments for add-ons, including subscriptions, that they purchase via apps distributed through Google Play.[6]

3.     This suit concerns Google Play, Google's store for Android OS apps, and the in-app add-ons or other digital products, including subscriptions, that developers make available for sale via their apps.[7] It concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for Android OS app distribution. And it concerns Google's improper attainment and maintenance of a monopoly in the U.S. market for in-app product distribution services, which services consist primarily of payment processing for items purchased in-app. It concerns the harm caused by Google's ongoing abuse of its market power, including the exclusion of competition, the

---

United States House of Representatives (October 6, 2020) ("House Report") at 94, available at https://judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf (last accessed Oct. 21, 2020).

[4] *Id.* at 95.

[5] https://yourbusiness.azcentral.com/apple-apps-compatible-android-20369.html (last accessed Aug. 15, 2020); *see* House Report at 94.

[6] *See* House Report at 95 ("The App Store and the Play Store do not compete against one another. Android users cannot access the Apple App Store, and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa.") (citation omitted); *id.* at 102 ("high switching costs and a lack of on-device competition means that neither firm's market power is disciplined by the presence of the other.").

[7] *See, e.g.*, https://play.google.com/store?hl=en (Google Play web page) (last accessed Aug. 15, 2020).

stifling of innovation, the inhibition of consumer choice, and Google's imposition on app developers of a supracompetitive default 30% transaction fee.[8]

4.     In fact, the CEO of Google's corporate parent, Alphabet, has admitted that Google's supracompetitive transaction fee is anything but an outcome of competition. Instead, it has "been the industry standard"—in other words, it is what Google's fellow monopolist Apple imposes in its parallel, closed iOS universe, so Google imposes it in its own Android sphere. And as Plaintiffs will demonstrate, Google's transaction fees have remained unlawfully high for all these years because Google has willfully—and effectively—excluded competition for developer services in its discrete Android universe.[9]

**Acquisition of monopoly (or monopsony) power in Android app and in-app markets**

5.     Google's Android OS[10] is one of the two dominant mobile device operating systems.[11] Google Play is the 1,000-pound gorilla of app providers to the many hundreds of millions of Android OS device consumers. While Google does not publish its share among app stores for the Android mobile operating system, in the European Economic Area, it is at "more than *90%*."[12]

6.     But Google has not attained and maintained such dominance because its app store is somehow unique or better than any potential competition. Rather, as demonstrated below,[13] Google has attained and maintained monopoly status in the U.S. market for Android OS app distribution

---

[8] This is the standard, or default, rate. *See* n. 31, *infra*, for a description of a variation for certain subscription payments made via Google's in-app purchase mechanism.

[9] Alphabet Inc. (Goog) (Google) Q4 2018 Earnings Conf. Call Transcript, available at: https://www.fool.com/earnings/call-transcripts/2019/02/04/alphabet-inc-goog-googl-q4-2018-earnings-conferenc.aspx (last accessed Aug. 15, 2020).

[10] *See* Alphabet's (Google's parent) 2017 10-K, https://abc.xyz/investor/pdf/20171231_alphabet_10K.pdf, at 3 (referring to Google's acquisition of Android, and referring to Android as one of its "core products").

[11] The other is Apple's iOS. In July 2020, Android's U.S. market share was at 41.03%, versus 58.78% for iOS. (http://gs.statcounter.com/os-market-share/mobile/united-states-of-america (last accessed Aug. 15, 2020).)

[12] https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 (last accessed Aug. 15, 2020).

[13] *See* Sections. V.F-IV.H, *infra*.

through a series of anticompetitive contracts, strategic abuses of its dominance in other[14] Android software applications, deficits in consumer knowledge and information, and the cultivation and exploitation of device users' fear of malware.

7.      *First*, Google has attained monopoly status in the U.S. market for Android OS app distribution in part by bundling the Google Play store with its other must-have apps (themselves made must-have by Google's forced-bundling practices).[15] If a manufacturer of an Android OS device wanted (or wants) to pre-install the popular YouTube or Google Maps apps on devices sold in the U.S., it has to take the Google Play store as well. This results in the pre-installation of Google Play on many tens of millions of U.S. devices every year.[16] And of course, the ubiquity of these pre-installations only reinforces Google Play's status as the perceived official app store for Android apps.

8.      *Second*, Google maintains and reinforces its monopoly status banning the distribution of other Android app-sale clients in Google Play.[17] For example, Amazon runs an app store for Android OS apps, but there is no easy or readily available way for the typical Android OS device

---

[14] Google Play is itself a software application, known in the instant context as a client. *See* https://en.wikipedia.org/wiki/Client_(computing)#:~:text=In%20computing%2C%20a%20client%20is,by%20way%20of%20a%20network. (last accessed Aug. 15, 2020).

[15] House Report, at 213 (finding that "Google required that any smartphone manufacturer seeking to license Android preinstall Google Search and Google Play Store, alongside a host of other rotating apps selected by Google.") (citation omitted).

[16] For example, one study indicates that at least 27.5 million Android devices were sold in the U.S. in Q3 2017. (*See* Data 29.5 Million US Smartphone Shipments in Q3, 2017, Android Headlines, available at: https://www.androidheadlines.com/2017/11/data-39-5-million-us-smartphone-shipments-in-q3-2017.html (last accessed Aug. 15, 2020).) Samsung, LG, ZTE, and Motorola alone sold 23.5 million of these devices. (*Id.*) And each of these manufacturers preloads Google Play on some, if not all or most, of its U.S. devices. According to the European Commission, the Google Play Store is pre-installed by device manufacturers on practically all Android mobile devices sold outside of China.

[17] *See* House Report, at 219 ("Because Google's Play Store is the primary way that users install applications on Android devices, the Play Store effectively functions as a gatekeeper for software distribution on a majority of the world's mobile devices.")

owner to buy anything from it. Google's practices require the vast majority of users to sideload[18] the Amazon Appstore by locating the client online[19]; figuring out the sideload process; and changing a security setting on his or her device that allows a practice that Google, as the owner of the standard Android operating system, strongly discourages[20] (enabling the ominous-sounding "Unknown sources" download capability). "Google has created significant friction for sideloading apps to Android devices….[S]ideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading."[21] As Google well knows and intends, hardly any members of its enormous Google Play install base will go to this trouble, if they even know such a process may be available. And still others will heed Google's security warnings and not go through with the installation.[22] "Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps."[23] No wonder app developers feel bound to sell in Google Play, whatever the cost.[24]

9.     *Third*, by so-called anti-fragmentation contractual terms, Google prohibits licensees of apps such as YouTube and Google Play from manufacturing or selling even a single smart device using a so-called forked version, *i.e.*, a non-Google variant, of Android.[25] Amazon is the author and

---

[18] "Sideloading is the installation of an application on a mobile device without using the device's official application-distribution method." (https://searchmobilecomputing.techtarget.com/definition/sideloading (last accessed Aug. 15, 2020)).

[19] *See* House Report at 220 ("Rival app stores that are not pre-installed on the device, such as the Amazon Appstore, must be sideloaded.").

[20] *See id.* ("Although sideloading is technically an option for rival app stores and app developers, market participants explained that Google goes out of its way to make side-loading difficult.")

[21] House Report at 97.

[22] *See, e.g.*, "Download apps to your Android device," available at: https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020) (setting forth official safety warnings for those who would venture outside Google Play).

[23] House Report at 97-98.

[24] *See* House Report at 219 ("Google uses its Play Store gatekeeper power to charge high fees to mobile developers.").

[25] *See e.g.*, https://developer.amazon.com/docs/fire-tv/fire-os-overview.html (last accessed Aug. 15, 2020); House Report at 212-13 ("Only through Google's licensing agreements can smartphone

distributor of Fire OS, an Android variant. This Android fork powers Amazon's tablets.[26] Yet because Google's anticompetitive contracts prohibit players large and small from deploying Fire OS, it has not reached its competitive potential; it remains essentially an Amazon-only OS, despite other manufacturers' reported interest in adopting it.[27]  Because Google regularly prohibits almost all Android device manufacturers from pre-installing Fire OS on their phones and tablets, Google has further limited the Amazon Appstore's competitiveness (which otherwise would be pre-installed on those additional Fire OS devices).

10.     Google's abuse of its power regarding Google Play is part of the behavior that led Europe to fine Google a record €4.34 billion, then about $5.1 billion.[28] In fact—in Europe—due to the E.U.'s action, Google has recently de-coupled Google Play and other popular apps from its Search and Chrome apps, the latter of which were part and parcel of its monopolistic dominance in mobile search. And Google also will cease its practice of refusing to license its apps to manufacturers who want to build devices with an Android-forked OS—but only for devices sold into the European Economic Area. Google's EU concessions do not apply to devices sold into the U.S.

11.     *Fourth*, Google makes overblown, self-serving, and unjustifiable claims regarding security in order to dissuade consumers from downloading and trying competitors' app stores. Not

---

manufacturers access Google's proprietary apps, such as Gmail, YouTube, Chrome, Google Maps, and Google Play Store. In return, Google requires that certain apps must be pre-installed and must receive prominent placement on mobile devices. Device manufacturers must also enter an agreement that prevents them from customizing Android, and from building an Android fork that would make the version of Android running on the device incompatible with apps built for the Android ecosystem.") (citations omitted); *id.* at 217 ("Google also requires hardware partners to agree that they will not run unsanctioned versions of Android on other hardware products, with the understanding that any manufacturer who violates this condition risks losing access to the Google Play Store and other popular apps across all of the manufacturer's devices.") (citation omitted).

[26] It is also the operating system for Amazon's Fire Phone, a now-discontinued device of which Amazon sold very few. *See* https://www.phonearena.com/phones/Amazon-Fire-Phone_id8731 (last accessed Aug. 15, 2020).

[27] *See* https://ec.europa.eu/commission/presscorner/detail/en/IP_18_4581 ((last accessed Aug. 17, 2020).

[28] *See. e.g.*, https://www.nytimes.com/2018/07/18/technology/google-eu-android-fine.html (last accessed Aug. 15, 2020).

content to rely solely on its huge install base for Google Play, which itself was obtained by anticompetitive means, Google also uses official Android warnings, and security mechanisms on Android OS devices to convince consumers that it is too risky to try its competitors' stores. And if all of these security warnings are not enough, then Google will use its security systems to interfere with the ability of users to make purchases from other stores.

12. For example, its abuse of power on ostensible security grounds led to an injunction issued by a Portuguese court, applicable throughout Europe, barring Google from using purported security measures to dissuade consumers from using an alternative Android OS app store, and from going so far as to disable it on devices on which users had found a way to install it.[29] Google, it appears, will take most any step to protect and bolster its multi-billion dollar Android app-store business. And because Google willfully monopolizes the retail terminus of Android app distribution by way of the conduct alleged herein, it likewise monopolizes (or monopsonizes) Android app distribution services, as well as the market for Android in-app payment processing.

**Abuse of monopoly (or monopsony) power through Google Play**

**Generally**

13. Having gained monopoly power through anticompetitive conduct in the U.S. market for Android OS app distribution, Google abuses that power by continuing to stifle innovation and consumer choice. Its overbearing contracts and practices "cut off the air supply" even from well-resourced competitors such as Amazon, robbing the marketplace of innovative means of distributing apps at lower costs to developers. And by stifling competition, Google deprives consumers of readily accessible and vibrant choices in the U.S. market for Android OS app distribution. Moreover, as described herein, Google correspondingly has willfully and unlawfully acquired, maintained, and abused monopoly power, and otherwise acted improperly and unlawfully, in the U.S. Android developer distribution and payment processing markets as alleged herein.

---

[29] *See* https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

**30% default transaction fee**

14.     Google has abused its unlawfully gained dominance to impose supracompetitive pricing: a default *30%* service fee[30] paid by developers on each sale of non-zero-priced Android OS app purchases[31] made at its Google Play store, and, as the case may be, on sales of in-app digital add-ons, including subscriptions, distributed via apps sold in Google Play.[32] So if an app or in-app add-on in Google Play costs $1.99, Google takes nearly *$.60*.[33] As for in-app sales, this charge is essentially for payment-processing services, which could be purchased from other providers at much cheaper rates,[34] and with faster payments to developers, if only Google permitted developers to use them. Tellingly, Google has succeeded in maintaining this astounding and exploitative 30% take rate (with

---

[30] Google's current and past 70% (developer) / 30% (Google) revenue split is memorialized at paragraph 3.4 of its Google Play Developer Distribution Agreement by reference to a Service Fee, which in turn is linked to Google's "Service fees" schedule. (*See* https://play.google.com/about/developer-distribution-agreement.html (Dev. Agr.) (last accessed Aug. 15, 2020), available at: https://support.google.com/googleplay/android-developer/answer/112622?hl=en ("For apps and in-app products offered through Google Play, the service fee is equivalent to 30% of the price. You receive 70% of the payment. The remaining 30% goes to the distribution partner and operating fees.") (last accessed Aug. 15, 2020).)

[31] Google has modified its service-fee structure with respect to subscriptions. (https://support.google.com/googleplay/android-developer/answer/112622?hl=en ("As of January 1, 2018, the transaction fee for subscription products decreases to 15% for any subscribers you retain after 12 paid months. If a subscriber has been active as of this date, that time will be counted. For example, if a subscriber has been active for 4 months, the transaction fee will be reduced to 15% after 8 more paid months.").)

[32] Google also charges developers a $25 fee to set up a Google Play developer account. (https://support.google.com/googleplay/android-developer/answer/6112435?hl=en) ("There is a $25 USD one-time registration fee . . . .") (last accessed Aug. 15, 2020).) This fee helps offset costs that Google may claim as justification for its incredibly high 30% service fee, especially considering the sheer number of developers from whom Google collects it.

[33] Or, alternatively, a sum calculated on the basis of a still-supracompetitive 15% commission on certain subscriptions, *see* n.31, *supra*, for what amounts to payment processing services that could be purchased much cheaper from other provider, if Google permitted developers to use them.

[34] The cost of alternative electronic payment processing tools, which Google does not permit to be used for the purchase of in-app digital content or within Android games, can be one tenth of the 30% cost of Google Play Billing. For example, the base U.S. rate for electronic payment processing tool PayPay is 2.9%, for Stripe it is also 2.9%, for Square it is 2.6%-3.5%, and for Braintree it is 2.9%. That is particularly so for PayPal's microtransaction rates (for developers whose sales average under $10), the latter of which do not include a separate fee on top of the percentage-of-sale-price charge.

the exception noted below) since it opened its app store in 2008, despite, *e.g.*, accrued economies of scale.

15.     By imposing this unjustified default 30% tax rate on paid Google Play transactions, including as to in-app digital product distributions, and by inserting the requisite terms into its contracts with developers, Google extracts more money from developers than they would otherwise have to pay for the distribution of Android OS apps and add-ons sold via in-app purchase, including subscriptions. But for Google's exclusionary behavior, including as to in-app payment processing as alleged herein, the Android app distribution market (as well as the tied payment processing market) would have more, and more meaningful and effective, competition.

16.     Compelling evidence of Google's supracompetitive pricing comes from Google's own Chrome Web Store, in which it charges developers not 30%, but 5% transaction fees.[35]

17.     Furthermore, Google's behavior depresses output. But for Google's abusive behavior, developers would have more pricing flexibility in the hugely dominant Google Play store—and pricing flexibility is, of course, useful.[36] There would be more distribution transactions but for Google's anticompetitive behavior. Therefore, Google's abusive behavior depresses output of transactions in the U.S. market for Android OS app distribution. App developers would create and sell more product but for Google's supracompetitive default 30% tax.

**$.99 minimum-price agreement**

18.     Google also abuses its unlawfully obtained monopoly power by way of minimum price fixing. Through its adhesive contracts with developers, it requires that regularly priced paid apps, in-app purchases, and subscriptions for U.S. consumers be priced no lower than $.99. So, for example, there can be no regularly priced $.69 apps or in-app products sold in Google Play.

19.     There is no pro-competitive justification for this minimum-price requirement. Minimum price fixing in Google Play has no salutary effects on inter-brand competition, a typical purported justification for such requirements. Rather, this mandatory pricing term was designed for

---

[35] *See* Section V.H.4, *infra*.

[36] *See, e.g.*, discussion in Sections V.G and V.H.

1    the purpose of enabling Google to earn at least 30 cents on every dollar spent in the Google Play

2    store.

3            20.    Google's minimum-price mandate also depresses output. In light of consumers'

4    demonstrably strong preference for low-priced apps and related products, developers would sell

5    more apps and app-related products but for this requirement.

6            21.    In sum, Google's willful acquisition and maintenance of monopoly power in the

7    markets identified, and its abuse of that power, *inter alia*, to impose its supracompetitive distribution

8    and in-app payment processing fees on U.S. Android OS developers such as the Plaintiffs, are

9    harmful to competition and harmful to developers specifically. Alternatively, if Google is determined

10    to be the purchaser of digital products from Android OS developers that in turn sells these products

11    to end-users, via Google Play or otherwise, then Google (also) acts as a monopsonist, or attempted

12    monopsonist. (A monopsonist is a buy-side monopolist.) The circumstances, effects, and allegations

13    are essentially the same for monopoly or attempted monopoly: By Google's behavior as alleged

14    herein, Google uses its monopsony power to underpay Android OS developers below the price they

15    would obtain in a competitive market for their apps and in-app products. Therefore, Plaintiffs'

16    allegations herein should be understood to also plead in the alternative claims based on monopsony,

17    both for Plaintiffs and the putative class. In either alternative—and as otherwise pled herein—

18    Google's behavior violates antitrust and consumer protection laws.

19            22.    Plaintiffs seek monetary relief to redress the injuries caused by Google's past and

20    ongoing conduct, and seek injunctive relief to stop Google's ongoing improper, unlawful, and

21    harmful behavior in the relevant markets.

22                   **II.**        **JURISDICTION AND VENUE**

23            23.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

24    because Plaintiffs allege violations of federal law, namely, the federal Sherman Act. The Court has

25    supplemental jurisdiction over the Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367(a).

26            24.    This Court has personal jurisdiction over the Defendants. Google LLC and Google

27    Payment are headquartered in this District. All Defendants have engaged in sufficient minimum

28    contacts with the United States and have purposefully availed themselves of the benefits and

protections of United States and California law, such that the exercise of jurisdiction over them would comport with due process requirements. Further, the Defendants have consented to the exercise of personal jurisdiction by this Court.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Google LLC and Google Payment maintain their principal places of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and because, pursuant to 28 U.S.C. § 1391(c)(3), any Defendants not resident in the United States may be sued in any judicial district and their joinder with others shall be disregarded in determining proper venue. In the alternative, personal jurisdiction and venue also may be deemed proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District. Furthermore, the Google Play Terms of Service incorporates the Google Terms of Service by reference, and the latter designates this judicial district as the federal venue for this action.[37]

### III.     INTRA-DISTRICT ASSIGNMENT

26.     Pursuant to N.D. Cal. Civil Local Rule 3-2 and General Order 44, this antitrust class action has been assigned on a district-wide basis and is not subject to reassignment on the basis of intra-district venue.

### IV.     PARTIES

**A.     The Plaintiffs**

27.     Plaintiff Pure Sweat Basketball Inc. ("Pure Sweat Basketball") is an Illinois corporation with its principal place of business in Crystal Lake, Illinois. It is the developer of the Pure Sweat Basketball Workout App. Pure Sweat Basketball is a party to the developer contracts

---

[37] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.") (last accessed Aug. 15, 2020).

referenced in this complaint. These agreements specify the commission rate and pricing and other mandates described herein. Also, in order to be permitted to make its app available in Google Play, and to sell non-zero priced subscriptions through its app, Pure Sweat Basketball has paid Google's $25 developer fee. To the best of its knowledge, Pure Sweat Basketball's last distributions of its app through Google Play, and sales of subscriptions at non-zero prices through the app, have occurred this year. Pure Sweat Basketball charges $4.99 monthly for its digital subscription product, or $49.99 annually, and it has paid Google's supracompetitive 30% commission on each sale.

28.     Alternatively, Google paid Pure Sweat Basketball what amounts to an artificially low wholesale price for digital products sold via Google Play. Furthermore, Pure Sweat Basketball's in-app subscription sales (like the app, if sold at above-zero prices) have always been subject to Google's requirement that app transactions be priced at a minimum of $.99, as well as other pricing mandates. Google has denied Pure Sweat Basketball the ability to choose to sell digital products at price points below $.99, in efforts to achieve maximum sales and effect business plans as it would elect, to Plaintiffs detriment.

29.     Plaintiff Peekya App Services, Inc. ("Peekya") is a Florida corporation with its principal place of business in Sarasota, Florida. Peekya developed and maintains an app called "*Peekya*" that has been and currently is distributed through Google Play. Peekya is a party to and has complied with the Google-developer contracts that are described in this Complaint. In order to sell its app through Google Play for $2.99, Peekya has paid Google's $25 developer fee. Within the four years preceding the filing of this Complaint, Android mobile device users have purchased and downloaded *Peekya*. For each such download, Google has taken a 30% commission from the payment remitted to Plaintiff. Alternatively, Google paid Peekya an artificially low wholesale price for digital downloads of *Peekya* sold through Google Play. Furthermore, Peekya's pricing of its app has always been subject to Google's requirement that app transactions be priced at a minimum of $.99, as well as other pricing mandates. Google has denied Peekya the ability to choose to sell digital products at price points below $.99, in efforts to achieve maximum sales and effect business plans as it would elect, to Plaintiff's detriment

1

## B.     The Defendants

2      30.     Defendant Google LLC is a Delaware limited liability company with its headquarters

3  and principal place of business in Mountain View, California. It is the owner of Google Play, from

4  and by which developers of Android apps sell paid applications, music, movies, books and in-app

5  products to Android device owners. Its parent, Alphabet Inc., was number 15 on last year's U.S.

6  Fortune 500,[38] with 2019 revenues of nearly $137 billion and net income of $30.736 billion.[39]

7      31.     Defendant Google Ireland Limited is a limited company organized under the laws of

8  Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.

9  Google Ireland contracts with all app developers that distribute their apps through Google Play and is

10 therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

11     32.     Defendant Google Commerce Limited is a limited company organized under the laws

12 of Ireland with its principal place of business in Dublin, Ireland, and a subsidiary of Google LLC.

13 Google Commerce contracts with all app developers that distribute their apps through Google Play

14 and is therefore a party to the anticompetitive contractual restrictions at issue in this complaint.

15     33.     Defendant Google Asia Pacific Pte. Ltd. is a private limited company organized under

16 the laws of Singapore with its principal place of business in Mapletree Business City, Singapore, and

17 a subsidiary of Google LLC. Google Asia Pacific contracts with all app developers that distribute

18 their apps through Google Play and is therefore a party to the anticompetitive contractual restrictions

19 at issue in this complaint.

20     34.     Defendant Google Payment Corp. is a Delaware corporation with its principal place

21 of business in Mountain View, California, and a subsidiary of Google LLC. Google Payment

22 provides in-app payment processing services to Android app developers and Android users and

23 collects a 30% commission on many types of processed payments, including payments for apps sold

24 through Google Play and in-app purchases made within such apps.

25

26

27     [38] https://fortune.com/fortune500/2019/alphabet/ (last accessed Aug. 15, 2020).

28     [39] *Id.*

# V. RELEVANT FACTS

35.     Google has injured Plaintiffs, the putative class of U.S. developers they seek to represent, and competition in the relevant markets, *see* Part VII, by way of its unlawful behavior in the U.S. sale of paid Android OS apps from its Google Play store and in-app sales of in-app add-ons, including but not limited to subscriptions. As the holder of an unlawfully obtained monopoly in the U.S. market for Android OS app distribution, Google's behavior has resulted in developer overcharges in these transactions due to its imposition of a supracompetitive 30% fee on each paid sale from its store. Also, Google's aggressive and improper monopolization (or attempted monopolization) of the U.S. Android OS app[40] distribution market has stifled competition by strongly inhibiting the emergence of vibrant, and viable, competitors, which reinforces and strengthens its pernicious and overbearing monopoly power.

36.     Additionally, Google requires app developers to sell at minimum prices. There is no pro-competitive justification for this practice, and certainly none in an environment where Google Play already is overwhelmingly dominant in the U.S. space for Android OS distribution services and app stores.

## A.      The Market for Licensable Smart Mobile Operating Systems

37.     Smart mobile devices are handheld, portable electronic devices that enable the user to connect wirelessly to the Internet and perform many of the functions traditionally associated with desktop and laptop computers. They include smart phones and tablets. Consumers use smart mobile devices to browse the Internet, shop, access social media, stream music and videos, read books, and play games.

38.     Like desktop and laptop computers, smart mobile devices require an operating system, or "OS." OSs are software products that control the basic functions of a computer. Without an OS, the user cannot operate the computer or run software on it. OSs designed for smart mobile devices are "smart mobile OSs."

---

[40] Throughout this complaint, references to "Android OS apps" also refer to in-app purchases and paid subscriptions.

39.     In addition to the features typically found in a desktop or laptop computer OS, smart mobile OSs include features such as a touchscreen, cellular, Bluetooth, and Wi-Fi capabilities, GPS mobile navigation, cameras, video cameras, speech recognition capability, voice recorders, music players, personal digital assistants and other features.

40.     Licensable smart mobile OSs constitute a distinct product market. Although desktop and laptop computers, early mobile phones (like flip phones) and game consoles also use OSs, those OSs are not compatible with smart mobile devices and are not included in the relevant market. From the demand side, makers of smart mobile devices—original equipment manufacturers or "device manufacturers"—cannot use the OSs found in computers, older flip phones or game consoles to power their smart mobile devices. From the supply side, any OS developer that switched from a computer, flip phone or game console-compatible OS to a smart mobile OS would have to invest substantial time and money in re-designing the OS to account for the specific functionalities of smart mobile devices.

41.     As the Congressional committee recently found, Google has "durable and persistent market power" in this "mobile operating system market."[41] This was not a groundbreaking conclusion. Following a years-long investigation, the European Commission ("EC" or "Commission") concluded in a July 18, 2018 decision that Google abused its dominant power in the Android app distribution market by tying Google Search to the Play Store, and by tying Google Chrome to the Play Store and Google Search. The Commission ordered Google to pay a $5.1 billion fine and to change its practices. Google is currently appealing the decision but asserts that it has complied with the Commission's conduct remedies by changing its contracts with manufacturers that ship phones and tablets into the European Economic Area.

42.     In the EC's Google Android case, Google did not contest the Commission's conclusion that smart mobile OSs constitute a distinct product market.

43.     Smart phone OSs and tablet OSs make up the smart mobile OS product market. From the demand side, the same OS, or similar versions of it, power both smartphones and tablets. From

_____

[41] House Report, at 94.

the supply side, all of the principal OS developers use the same OS to power both smartphones and tablets. Apple, for example, which makes both the OS and the hardware for its smartphones and tablets, has confirmed that it uses a single OS for its iPhone and iPad. In the EC Google Android case, Google did not contest the Commission's conclusion that smart phone and tablet OSs belong in the same product market.

44.     Manufacturers of smart mobile devices ("device manufacturers") pre-install smart mobile OSs on devices before selling them to retailers and end users. Most device manufacturers do not develop their own OSs but instead license Google's Android OS. The most widely-used mobile non-Android OS outside of China is Apple's iOS. But because Apple does not license its operating system to device manufacturers, instead manufacturing its own smart phones and tablets, Apple's iOS is not an option for device manufacturers.

45.     Non-licensable smart mobile OSs such as Apple's iOS do not belong to the same product market as licensable smart mobile OSs. From the demand side, device manufacturers cannot obtain a license to pre-install Apple's iOS because Apple does not license iOS to competing device manufacturers. As even Google has conceded, device manufacturers cannot switch to non-licensable OSs such as iOS.

46.     From the supply side, even assuming Apple decided to license iOS to competing device manufacturers, it would probably take device manufacturers at least two years to make all the changes necessary to migrate to iOS, according to market participants. And the likelihood that Apple would decide voluntarily to license iOS to competing device manufacturers is pretty much nil. Apple's legendary strategy of remaining vertically integrated within its "walled garden" and selling luxury products to loyal customers has been wildly successful. What other company has exceeded a market capitalization of $2 trillion? As device manufacturer Nokia put it: "Apple has no incentives to enter the market for licensable OS[s] by starting to license iOS to third party device manufacturers. This is because Apple currently holds a monopoly over the supply of iOS compatible devices. Apple makes most of its mobile profits with device sales and opening the system for third party device

manufacturer competition would be likely to erode Apple's device profits. […] Apple does not need to expand its ecosystem in order to attract developers."[42]

47.     The European Commission concluded that Apple's iOS "exercises an insufficient indirect constraint on Google's dominant position in the worldwide (excluding China) market for licensable smart mobile OSs," confirming that iOS should not be included in the relevant market for licensable smart mobile OSs.[43]

48.     Google possesses monopoly power in the market for licensable smart mobile OSs. This monopoly power is demonstrated by Google's market share, the existence of high barriers to entry and expansion, the lack of countervailing buyer power, and the lack of constraint posed by non-licensable smart mobile OSs such as Apple's iOS.

49.     The EC found in its 2018 Google Android decision that Android OS is installed on more than 95% of smart mobile devices with licensed mobile OSs worldwide, excluding China. In the United States, that percentage currently appears to be even higher. As of July 2020, 98.85% of smartphones with licensed mobile OSs were powered by Android, compared to just .15% for other licensed mobile OSs (Samsung's share was .11%; Windows was .02%, and "unknown" was .02%). For that same period, Windows, Linux and "unknown" licensable mobile OSs collectively powered only .17% of tablets, leaving the remaining 98.83% to Google. There also has been very little competitor entry, while at the same time "once-competitive mobile operating systems like Nokia, BlackBerry, and Microsoft struggled to survive as Apple and Google grew more dominant, eventually exiting the marketplace altogether."[44] The only other licensable smart mobile OSs that have entered the market since 2011 have not made a dent in Google's market share. The most

---

[42] Statement in Intervention by Bundesverband Digitalpublisher und Zeitungsverleger e.V. (*Google LLC v. European Comm'n*), Case No. T-604/18, at ¶ 41 n.31 (June 26, 2020) ("BDZV Intervention").

[43] *See* European Commission, *Google Android*, Case AT 40099, Commission Decision of 18 July 2018, at ¶243, §§7.3.5 & 9.3.4, available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf (last accessed Oct. 21, 2020).

[44] House Report at 106; *see id.* at 105 ("Over the past decade, several large technology companies have attempted and failed to leverage their large user bases to compete against Apple and Google in the mobile OS market.") (citation omitted).

prominent competitor—Microsoft—dropped below 2% market share in 2016 and exited the market shortly thereafter.[45] The other providers, including Firefox OS, Tizen and Sailfish, have been unable to gain more than .2% market share. As the House Subcommittee reported, "[i]industry experts have testified before the Subcommittee that the 'reality is that it would be very difficult for a new mobile phone operating system today' to compete with Apple and Google, 'even if it offered better features.'"[46]

50.     The market for licensable smart mobile OSs is characterized by high barriers to entry and expansion. First, development of a smart mobile OS requires an enormous investment of time and money in research and development. Google claims, for example, that it subsidized the development of Android through advertising revenue derived from Google Search and Chrome.

51.     Equally important, network effects make entry less attractive to would-be competitors. App developers, who earn revenue through app downloads, in-app purchases, and ads, want to develop apps for mobile OSs that have a large user base and will not build apps for an OS with few users.[47] Google's giant install base of consumers who download apps creates strong incentives for developers to focus their efforts on developing for Google Android, rather than developing for multiple OSs.[48] Google itself submitted evidence in its appeal of the Commission's decision which confirmed this network effect: "As the Google App Store is preinstalled on most android devices, developers reach most users by publishing their App through the App store, which

---

[45] *See* id., at 106 ("In 2017 Microsoft abandoned its mobile OS business, and by that time, more than 99% of all new smartphones were running on iOS or Android and market observers expressed no confidence that new competition would emerge.") (citation omitted).

[46] House Report at 104 (citations omitted).

[47] *Id.* at 104-105 ("The most important factor that developers consider before building apps for an OS is the install base of the OS—how many users have devices running on the OS that can install the app. Developers will not build apps for an OS with few users.") (citation omitted).

[48] *See* id., at 106-107 ("One key factor leading to Microsoft's withdrawal from the mobile marketplace was that developers were reluctant to develop apps for a third mobile operating system when already building apps for iOS and Android. These market dynamics remain in place today.") (citation omitted).

makes the Google App Store the Store with the highest number of apps. Users prefer the store with the highest number of Apps which makes this a self-enforcing effect." [49]

52.     According to findings by the EC, Google's monopoly power is also supported by the lack of countervailing buyer power among device manufacturers. There are numerous device manufacturers that license Android OS for pre-installation in smart mobile devices. Of these, only Samsung had more than a 10% market share, demonstrating the diffusion of buyer power. This lack of buyer power is further evidenced by the apparently limited nature of the negotiations that occur between Google and device manufacturers when device manufacturers enter into licensing agreements with Google. The agreements are signed online, with the device manufacturer representative merely providing contact information and clicking in the relevant box accepting the terms and conditions of the agreement.

53.     Nor does Apple's non-licensable iOS impose sufficient indirect constraints to undermine Google's monopoly power in the market for licensable smart mobile OSs. As the EC has concluded, there are several reasons why Apple's iOS does not inhibit Google's monopoly power. First, there are significant price differences between Google Android and iOS devices. In the United States, the latest iPhone costs $1,099, compared to the latest Samsung Android phone, which costs $899. This disparate pricing reflects Apple's and Google's different commercial strategies. Apple's vertically-integrated approach is aimed at keeping its affluent, loyal customers in Apple's ecosystem, and purchasing its hardware and services, which generates the bulk of Apple's revenue. Of Apple's revenue for the third quarter of 2020, 78% was based in hardware such as iPhones, MacBooks, iPads and wearables. Google, on the other hand, wants to put Android devices in as many hands as possible to ensure its continued domination of search advertising, which generates the bulk of Google's revenue. In the first quarter of 2018, for example, 82% of Google's revenue came from advertising.

---

[49] BDZV Intervention at ¶ 126 n.199.

As the Netherlands Authority for Consumers & Markets put it in a recent study [50]: "In contrast to Apple and Microsoft, Android was not developed by Google to generate revenues through the sale of software or hardware. Android, apps, and the Play Store are only a means to an end to become embedded everywhere on the internet, and to increase the audience for its services so it can create more advertising space." As the House Subcommittee found, information collected via Android and the Play Store gave Google "intimate user profiles, spanning billions of people," which are "a key source of Google's advantage in its ad business."[51]

**B.    The Google Play Store**

54.    Google introduced its app store, then known as Android Market, in or about August 2008.[52] Within weeks, Google, HTC, and T-Mobile released the first Android OS smartphone, the T-Mobile G-1.[53] This very first released-to-consumer Android OS smartphone came pre-loaded with the Android Market client. As T-Mobile's September 2008 press release explained:

> **Android Market:**
>
> The T-Mobile G1 is the first phone to offer access to Android Market, which hosts unique applications and mash ups of existing and new services from developers around the world. With just a couple of short clicks, customers can find and download a wide range of innovative software applications — from games to social networking and on-the-go shopping — to personalize their phone and enhance their mobile lifestyle. When the phone launches next month, dozens of unique, first-of-a-kind Android applications will be available for download on Android Market . . . .[54]

---

[50] The Netherlands Authority for Consumers & Markets, "Market Study into Mobile App Stores" (April 11, 2019) ("Market Study") at 28, available at https://www.acm.nl/sites/default/files/documents/market-study-into-mobile-app-stores.pdf (last accessed Oct. 21, 2020).

[51] House Report at 217-18.

[52] Google launched Android Market, Google Play's predecessor for Android OS Apps, on or about August 28, 2008. (*See, e.g.*, https://www.cnet.com/news/google-announces-android-market-for-phone-apps/ (dated Aug. 28, 2008) (last accessed Aug. 15, 2020).)

[53] "T-Mobile Unveils the T-Mobile G1—the First Phone Powered by Android," dated September 22 (and 23), 2008, available at: https://www.t-mobile.com/news/t-mobile-unveils-the-t-mobile-g1-the-first-phone-powered-by (last accessed Aug. 15, 2020).

[54] *Id.*

55.     Next, on or about March 6, 2012,[55] Google introduced its Google Play store. Google Play both succeeded and subsumed its predecessor, Android Market, adding digitized music and books to the store's offerings.[56] It now carries movies and television programs as well.[57]

56.     To sell their products through the Google Play store, app developers[58] enter into the Google Play Developer Distribution Agreement.[59] The developer then uploads its product to Google servers for review, testing (if any), limited release (if any), and production-release for sale to consumers in the store.[60] As part of the process, the developer "grant[s] to Google a nonexclusive and royalty-free license to distribute [the developer's] Products in the manner indicated in the Play Console."[61]

57.     Developers ostensibly set prices for products sold in the Google Play store. But, as described above, Google's developer contract (more specifically, its incorporated terms or policies) requires that paid products be sold to U.S. consumers at a regular price of no lower than $.99 (and a

---

[55] https://googleblog.blogspot.com/2012/03/introducing-google-play-all-your.html (last accessed Aug. 15, 2020).

[56] *Id.* ("Starting today, Android Market, Google Music and the Google eBookstore will become part of Google Play. On your Android phone or tablet, we'll be upgrading the Android Market app to the Google Play Store app over the coming days.").

[57] https://play.google.com/store/apps/details?id=com.google.android.videos&hl=en_US (last accessed Aug. 15, 2020).

[58] Except presumably Google, which also offers its own products—including paid products—in the Google Play store. (*See* https://play.google.com/store/apps/details?id=com.google.android.apps. youtube.music&hl=en (offering YouTube Music app in Google Play, and referring to the paid Music Premium version that is also available) (last accessed Aug. 15, 2020).

[59] Dev. Agr. (current agreement, effective as of Feb. 26, 2018) (Dev. Agr.) (last accessed Aug. 15, 2020). For the pre-Feb. 26, 2018 version, *see* https://play.google.com/about/developer-distribution-agreement/archive.html (last accessed Aug. 15, 2020).

[60] *Id.*, ¶ 4.2 ("You are responsible for uploading Your Products to Google Play, providing required Product information and support to users, and accurately disclosing the permissions necessary for the Product to function on user Devices.") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/113469?hl=en ("Upload an app") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/answer/7159011? ("Prepare & roll out releases") (last accessed Aug. 15, 2020).

[61] Dev. Agr., ¶ 5.1.

$400 maximum).[62] Therefore, developers cannot sell regularly priced apps at $.69, for example. The contract has, however, allowed for lower minimum prices for 18 other countries' purchasers since November 2015 (or earlier in 2015 for India).[63] For example, an app that must be priced for U.S. consumers no lower than $.99 can be priced at approximately $.13 for Indian purchasers, as of the exchange rate on Aug. 15, 2020.[64] There is no evidence that Google is somehow losing money by way of this contractual practice. But even if one posits hypothetically that it is, then U.S. developers (and consumers) are subsidizing consumers from other countries by way of the higher U.S. minimum prices and the sums that Google collects thereby, such that U.S. developers (and consumers) are paying more than they ought to be paying as a result of this restraint of trade.

58.     Developers sell their apps, in-app products,[65] and subscriptions[66] directly through the Google Play store. Consumers select apps from the displays that Google organizes and sets up; tender their payments to Google; and download the apps from Google to their devices.[67]

---

[62] Dev. Agr., ¶ 5.2 (referring to sales to be made "in the manner indicated in the Play Console"). The Play Console, and Play Console help sections, set forth the minimum pricing requirements: *see* https://support.google.com/googleplay/android-developer/answer/6334373?hl=en ("Set up prices & app distribution") (last accessed Aug. 15, 2020); https://support.google.com/googleplay/android-developer/table/3541286? ("Supported locations for distribution to Google Play users") (last accessed Aug. 15, 2020).

[63] *See, e.g.*, "Google slashes minimum app prices to way below $0.99 in 17 countries," *Mashable*, Nov. 18, 2015, available at: https://mashable.com/2015/11/18/google-minimum-app-prices/#JluQdT6ebEqd (last accessed Aug. 15, 2020).

[64] https://support.google.com/googleplay/android-developer/table/3541286 (apps for Indian consumers may be priced from between 10.00 INR to 26,000.00 INR, or approximately $.13 to $347.11, as of Aug. 15, 2020—*see* https://transferwise.com/us/currency-converter/inr-to-usd-rate?amount=10 (last accessed Aug. 15, 2020)).

[65] *See, e.g.*, https://support.google.com/googleplay/answer/1061913?hl=en&ref_topic=7049688# ("Make in-app purchases in Android apps") ("With some apps, you can buy additional content or services within the app. We call these 'in-app purchases.' Here are some examples of in-app purchases: A sword that gives you more power in a game . . . .") (last accessed Aug. 15, 2020).

[66] https://support.google.com/googleplay/answer/2476088?hl=en&ref_topic=1689236 ("Subscribe to services or content") (referring to subscriptions to magazines, newspapers, and other material, and explaining how to subscribe) (last accessed Aug. 15, 2020).

[67] *See, e.g.*, https://support.google.com/googleplay/answer/4355207?hl=en&ref_topic= 3364260&co=GENIE.Platform%3DAndroid&oco=1 ("Get started with Google Play"-Android) (last accessed Feb. 1, 2019); https://support.google.com/googleplay/answer/113409?hl=en&ref_topic=

59.     Developers, in turn, pay Google 30% of each paid sale of an app and most in-app

products and subscriptions.

60.     Developers are directly injured by Google's levying of a supracompetitive fee, a fee

which would be lower in a competitive market.

**C.      While the Android OS is superficially Open-source, Google Maintains an Iron grip on its Commercial Aspects.**

61.     Google owns and controls the Android OS. Ostensibly, the code for the operating

system itself is open-source. According to Google, anyone can download, use, and modify the

Android OS source code, as long as Google allows it. Google calls this aspect of its OS the Android

Open Source Project (AOSP). As Google[68] puts it:

> Android is an open source operating system for mobile devices and a
> corresponding open source project led by Google. This site and the
> Android Open Source Project (AOSP) repository offer the information
> and source code needed to create custom variants of the Android OS,
> port devices and accessories to the Android platform, and ensure
> devices meet the compatibility requirements that keep the Android
> ecosystem a healthy and stable environment for millions of users. . . .[69]

62.     But the open-source code only enables a device's most basic functions. As Google

explains: "The Android Open-Source Project (AOSP) is the core software stack behind the Android

OS and consists of the operating system, middleware, and open-source apps like a phone dialer,

email, and messaging. Mobile operators, device makers, and developers can use this to build devices

and apps."[70]

---

3365058 ("Get Android apps and digital content from the Google Play Store") ("1. Open the Google Play Store app. 2. Search or browse for content. 3. Select an item. 4. Tap Install (for free items) or the item's price. 5. Follow the onscreen instructions to complete the transaction and get the content.") (last accessed Aug. 15, 2020).

[68] "Android was originated by a group of companies known as the Open Handset Alliance, led by Google. . . . The Android Open Source Project is led by Google, who maintains and further develops Android." (https://source.android.com/setup/ (last accessed Aug. 15, 2020).)

[69] https://source.android.com/ (last accessed Aug. 15, 2020).

[70] "Understanding Android," available at: https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

63.     What makes a mobile device marketable and attractive to modern consumers is its apps. Google has developed several popular apps, including YouTube, Google Maps, Gmail as well as the Google Play client, among others. These are proprietary apps, and they are decidedly not open-source. Smartphone and tablet manufacturers must sign agreements to pre-install these apps on their Android OS devices, and for devices sold into the U.S., they come bundled together as a suite—manufacturers who want to pre-install any one of them must pre-install all of them.[71] Google refers to this program as Google Mobile Services. As Google touts it:

> The best of Google, right on your devices
>
> Google Mobile Services brings Google's most popular apps and APIs
> to your Android devices.
>
> Google's most popular apps, all in one place
>
> Google Mobile Services (GMS) is a collection of Google applications
> and APIs that help support functionality across devices. These apps
> work together seamlessly to ensure your device provides a great user
> experience right out of the box.[72]

64.     GMS is an element of how Google dominates the entire Android ecosystem. Indeed, the GMS restrictions "have strictly limited—if not excluded—third-party apps from being pre-installed. In this way, Google's licensing agreements not only preclude the vast majority of third-party apps from being pre-installed, but they also funnel those apps into the Google Play Store, subject to Google's commissions and arbitrary enforced policies."[73]

65.     Over time, Google has moved more and more apps into its proprietary, non-open-source universe of apps, as well as services that make third-party apps work effectively, in ways that

---

[71] "After building an Android compatible device, consider licensing Google Mobile Services (GMS), Google's proprietary suite of apps (Google Play, YouTube, Google Maps, Gmail, and more) that run on top of Android. GMS is not part of the Android Open Source Project and is available only through a license with Google." (https://source.android.com/compatibility/overview (last accessed Aug. 15, 2020).)

[72] https://www.android.com/gms/ (last accessed Aug. 15, 2020).

[73] House Report at 222-23.

FIRST CONSOLIDATED CLASS ACTION COMPLAINT                                    - 24 -
Case No.: 3:20-cv-05792-JD / 3:20-cv-06772-JD

users have come to expect (*e.g.*, by calling up map services, now through the proprietary Google

Maps). As one analyst describes Google's machinations:

> Over time, Google began migrating applications – like Search, Music, and the Calendar – out of AOSP and into GMS. Any OEM wanting to use AOSP to build its own Android fork would now have to build their own versions of these apps, on top of email, maps, and so on. (*Ars Technica* has a good rundown of the application migration here[74].) On top of that, the device would lack the Google services APIs that lots of third-party apps need. And Google didn't stop there. Google Mobile Services mutated into Google Play Services[75] in September 2012.

> A fork in the road: Why Google Play Services is key to understanding the 'forking' question

> Back in May 2013 at the Google I/O Keynote there was no mention of an Android upgrade. Instead, Google announced a bunch of new features to be rolled out to Android devices via Google Play Services. Google had started to move away from Android-as-platform to Play Services-as-platform. As Ron Amadeo writes: 'Play Services has system-level powers, but it's updatable. It's part of the Google apps package, so it's not open source. OEMs are not allowed to modify it, making it completely under Google's control… If you ever question the power of Google Play Services, try disabling it. Nearly every Google App on your device will break.' It is 'a single place that brings

---

[74] https://arstechnica.com/gadgets/2018/07/googles-iron-grip-on-android-controlling-open-source-by-any-means-necessary/ (last visited Dec. 10, 2018).

[75] Google Play services is different from the Google Play store. In fact, one method of distribution is via Google Play. (*See, e.g.*, https://play.google.com/store/apps/details?id=com.google.android.gms&hl=en_US ("Google Play services is used to update Google apps and apps from Google Play. This component provides core functionality like authentication to your Google services, synchronized contacts, access to all the latest user privacy settings, and higher quality, lower-powered location based services.") (last accessed Aug. 15, 2020).) In its Overview of Google Play Services, Google writes:

> With Google Play services, your app can take advantage of the latest, Google-powered features such as Maps, Google+, and more, with automatic platform updates distributed as an APK through the Google Play store. This makes it faster for your users to receive updates and easier for you to integrate the newest that Google has to offer.

> * * *

> The client library contains the interfaces to the individual Google services and allows you to obtain authorization from users to gain access to these services with their credentials.

https://developers.google.com/android/guides/overview (last accessed Aug. 15, 2020).

1
2

> in all of Google's APIs on Android 2.2 and above.' Things like Play
> Game services, Google Cloud Messaging and fused location services
> are all handled by Play Services, and not the OS.

3

66.    One important condition for access to GMS is that manufacturers agree to comply

4

with so-called compatibility requirements. As Google puts it:

5
6

> We ask GMS partners to pass a simple compatibility test and adhere to
> our compatibility requirements for their Android devices. In turn, your
> users enjoy greater app reliability and continuity.[76]

7

67.    Ostensibly, Google seeks compatibility to help assure that software works across a

8

variety of devices. But Google has gone further than merely requiring compatibility testing for

9

devices on which manufacturers wish to install the GMS suite. As part of its strategy to maintain as

10

much dominance over the Android ecosystem as possible, Google refuses to license GMS to

11

manufacturers who develop so-called Android forks—variants of the official Android OS published

12

by Google. As the European Commission put it with respect to the record antitrust fine it imposed on

13

Google last summer (discussed *infra*[77]):

14
15
16
17
18

> Google has prevented device manufacturers from using any alternative
> version of Android that was not approved by Google (Android forks).
> In order to be able to pre-install on their devices Google's proprietary
> apps, including the Play Store and Google Search, manufacturers had
> to commit not to develop or sell even a single device running on an
> Android fork. The Commission found that this conduct was abusive as
> of 2011, which is the date Google became dominant in the market for
> app stores for the Android mobile operating system.[78]

19

68.    According to the European Commission, this has thwarted even as powerful a

20

potential competitor as Amazon. Manufacturers who want access to GMS are prohibited by way of

21

their anti-fragmentation contractual terms with Google from building even a single device based on

22
23
24
25

[76] *Id.*

26

[77] *See* Section V.F.1, *infra*.

27
28

[78] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm (last accessed Aug. 15, 2020).

Amazon's Android OS fork, known as Fire OS. As discussed below, this means that Amazon is denied another way to distribute its own Android OS app store.[79]

69.     There is no justifiable basis for Google's restraints with regard to Android forks. As the European antitrust authorities found, Google's stated aim—to help ensure that software works across various Android OS devices—does not require or justify the restraints on competition that Google forces upon device manufacturers:

> The Commission also assessed in detail Google's arguments that these restrictions were necessary to prevent a "fragmentation" of the Android ecosystem, and concluded that these were not well founded. First, Google could have ensured that Android devices using Google proprietary apps and services were compliant with Google's technical requirements, without preventing the emergence of Android forks. Second, Google did not provide any credible evidence that Android forks would be affected by technical failures or fail to support apps.[80]

70.     Google further exercises control over the market by bundling Google Play Store with Google Play Services, a proprietary software layer that runs in the background on Android. It provides application programming interfaces (APIs) that enable apps to integrate with other apps and with Google services. Many of these Google services are critical to the functioning of apps. Without Google Play Services, for example, apps cannot provide basic "push notifications." As another example, more than half of the apps in Google Play use Google's cloud messaging service; nearly half use AdMob, Google's mobile advertising service. Apps cannot access these functionalities without Google Play Services. As the European Commission concluded, without Google Play Services, "many apps would either crash, or lack important functions."

---

[79] Per the European Commission:

> This practice reduced the opportunity for devices running on Android forks to be developed and sold. For example, the Commission has found evidence that Google's conduct prevented a number of large manufacturers from developing and selling devices based on Amazon's Android fork called "Fire OS."

> In doing so, Google has also closed off an important channel for competitors to introduce apps and services, in particular general search services, which could be pre-installed on Android forks.

http://europa.eu/rapid/press-release_IP-18-4581_en.htm (emphasis added).

[80] *Id.*

71.     Market participants agree that access to Google Play Services is critical. According to one mobile network operator, "without [Google Play Services] the Android OS would be more like a feature phone OS than a smartphone OS." Because many Google and third-party apps are "intimately tied with Google Play Services," according to one device manufacturer, many apps "do not function" without access to Google Play Services.

72.     Google does not license Google Play and Google Play Services separately. They can only be licensed together, thus further entrenching Google Play as the number one pre-installed app store.

**D.     Google is a Monopolist in the U.S. Markets for Android OS App Distribution and In-app Payment Processing.**

73.     Google's anticompetitive strategies around Android have worked. Via Google Play, Google is, and long has been, a monopolist in the U.S. markets for app distribution selling Android OS apps and in-app purchases (and subscriptions as well).  This monopoly power is demonstrated by Google's overwhelming market share, the existence of high barriers to entry and expansion, and the lack of countervailing buyer power. Apple's App Store, which is not in the relevant product market, does not exercise an indirect restraint sufficient to undermine Google's monopoly power.

74.     While Google resists disclosing its share of the U.S. Android OS app distribution market—going so far as to tell its employees not to "define markets or estimate market shares"[81]—its stranglehold can be inferred from the number of devices sold with Google Play pre-installed as well as the number of apps downloaded from app stores onto Android smart mobile devices. Given the vast number of compatible devices, [82] it is no surprise that the European Commission found that

---

[81] *See* https://dnyuz.com/2020/10/13/google-employees-are-free-to-speak-up-except-on-antitrust/; https://themarkup.org/google-the-giant/2020/08/07/google-documents-show-taboo-words-antitrust; https://www.documentcloud.org/documents/7016657-Five-Rules-of-Thumb-for-Written-Communications.html.

[82] *See, e.g.*, https://source.android.com/setup/start/faqs (frequently asked questions, providing details re: Android compatibility certification) (Devices that are 'Android compatible' may participate in the Android ecosystem, including Google Play . . . .") (last accessed Aug. 15, 2020).

Google Play is pre-installed by device manufacturers[83] on nearly all—more than 90%—of Android mobile devices sold outside of China. No other Android app store comes close to that number of pre-installed users. Samsung's Galaxy Apps Store, which is a distant second to Google Play, is the only app store that has come pre-installed on more than 10% of smart mobile devices outside of China, according to the Commission. And even Samsung pre-installs its own app store alongside Google Play. According to Samsung, it would "not be commercially feasible for an OEM to ship Android devices without Google Play preinstalled due to the variety and number of apps and contents available to users uniquely through the Google Play Store." The other app stores have even smaller installed user bases.

75.     Google Play also demonstrates its dominance by the number of apps downloaded from the store, and by the sheer number of apps available. Since 2011, more than 90% of apps on Android devices have been downloaded via the Play Store. In October of 2018, according to the Netherlands Authority for Consumers & Markets, Google Play offered 3.3 million apps, compared to less than one million for Aptoide. As Amazon said in the EC Android case, its own app store "lags behind the Play Store. . . . it has become increasingly difficult over time to obtain and retain a competitive selection of apps because, as the Play Store continues to grow by virtue of being pre-installed on all licensed Android devices, more and more app developers have focused their development efforts on developing apps that use [Google Play Services]."

76.     Because of their small shares of the user base, other existing Android mobile app stores cannot discipline Google's exercise of monopoly power in the Android app distribution market.

77.     The most dramatic proof of Google's monopoly power is its ability to impose a supracompetitive 30% "service fee" on every app, and most in-app products and services, sold through Google Play. Google justifies this extortionate tax by pointing to Apple's identical commission—essentially using a grownup version of "they did it first." But pricing by Apple—

---

[83] *See, e.g.*, https://support.google.com/googleplay/answer/1727131?hl=en (Google Play Help screen, providing 852-page list of supported devices, including devices manufactured by Samsung, HTC, LG, and Motorola, among many others) (last accessed Aug. 15, 2020).

which also faces monopolization allegations—is not the most relevant comparison. As David Heinemeir Hansson, CTO and Cofounder of Basecamp, a small internet software company, testified recently before Congress, businesses should not be required to "hand over 30% of their revenue for the privilege" of selling software through the Play Store or the App Store. "Most mobsters would not be so brazen as to ask for such an exorbitant cut. . . ." Hansson contrasted Google's 30% cut to the fees it pays to transact in the credit card processing market, where "we basically pay around 2% . . . and there are countless competitors constantly trying to win our business by offering lower rates. . . . Mobile application stores are not a competitive market, and the rates show."

78.     In the absence of Google's entrenched monopoly, rivals could establish app stores which compete, among other dimensions, on price. The CEO of Epic Games, for example, has suggested that "they could run a store with as little as an 8% cut while remaining profitable."

79.     The only independent app store with a market share greater than 1-2% is Aptoide, which has historically offered app developers a higher percentage of sales revenue than Google Play. Currently, the developer/app store split is 25/75%. Despite its more attractive pricing, Aptoide has not been able to attract enough developers to inhibit Google's monopoly power, due to Google's entrenched monopoly.

80.     There are significant barriers to entry and expansion in the market for Android app distribution. First, the cost of developing an app store that is relevant and able to compete with Google is, according to Sony, "prohibitive." Amazon, whose app store has barely made a dent in Google's market share, has dedicated hundreds of employees, and spent tens of millions of dollars annually over several years to develop and commercialize its app store. In addition, the cost of commercializing the store would be enormous because the app store would need to convince users to try a new Android app store despite the established position of the Play Store.

81.     Other significant barriers to entry and expansion have been erected by Google, which has excluded competition through its restrictive contracts with device manufacturer and developers and through its warning and threats to end users.

82.     Alternatively, Google is an attempted monopolist in the U.S. market for Android OS app distribution, and in the market for app in-app distribution services and payment processing services for U.S. Android app developers.

**E.     Apple Offers No Market Constraints**

83.     Nor does Apple, via its iOS mobile operating system, its iOS apps or its iOS App Store, provide any constraints to Google's market power. Apple has not developed or licensed an app store for Android, and it does not license its OS. Android device users therefore cannot purchase apps from Apple's App Store without switching to an Apple iOS iPhone or iPad

84.     Furthermore, the switching costs between Android and iOS are high.[84] Device owners have great sunk costs in their individual spheres: the cost of their phones or tablets; the learning curve inherent in each; and the money and time invested in apps and in-app purchases which, due to technical incompatibilities, cannot be transferred to iOS devices, to name some. Also, many owners of Android OS devices will not be able to afford Apple hardware, which is sold at premium prices, or they will not find the potential switch economically sensible, so they decline to make it.

85.     Europe is in accord. Per the European Commission:

> As a licensable operating system, Android is different from operating systems exclusively used by vertically integrated developers (like Apple iOS or Blackberry). Those are not part of the same market because they are not available for licence by third party device manufacturers.
>
> Nevertheless, the Commission investigated to what extent competition for end users (downstream), in particular between Apple and Android devices, could indirectly constrain Google's market power for the licensing of Android to device manufacturers (upstream). The Commission found that this competition does not sufficiently constrain Google upstream for a number of reasons, including:

---

[84] *See* House Report, at 102 ("Although both Google Android and Apple iOS both have dominant positions in the mobile OS market, high switching costs and a lack of on-device competition mean that neither firm's market power is disciplined by the presence of the other."); *see also id.*, at 102-103 ("There are significant barriers to switching between the dominant mobile operating systems. As a general matter, consumers rarely switch mobile operating systems. SellCell's 2019 survey found that more than 90% of users with iPhones tend to stick with Apple when they replace their current device.") (citations omitted).

end user purchasing decisions are influenced by a variety of factors (such as hardware features or device brand), which are independent from the mobile operating system;

Apple devices are typically priced higher than Android devices and may therefore not be accessible to a large part of the Android device user base;

Android device users face switching costs when switching to Apple devices, such as losing their apps, data and contacts, and having to learn how to use a new operating system; and

even if end users were to switch from Android to Apple devices, this would have limited impact on Google's core business. That's because Google Search is set as the default search engine on Apple devices and Apple users are therefore likely to continue using Google Search for their queries.[85]

86. Regarding app stores specifically, the European Commission has stated:

Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterized by high barriers to entry. *For similar reasons to those already listed above, Google's app store dominance is not constrained by Apple's App Store, which is only available on iOS devices.*[86]

**F.      Google Engages in Unlawful Behavior in Order to Restrain Trade and to Maintain and Grow its Monopoly.**

87.      Google maintains monopoly status in the U.S. Android OS app distribution market, which ensures that the vast majority of Android OS mobile and tablet owners will purchase paid apps and in-app items from Google Play.

88.      Cornering the market for Android OS app distribution translates to colossal profits, as alleged herein.

---

[85] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm. (last accessed Aug. 15, 2020).

[86] *Id.* (emphasis added).

**1.      Google was recently fined over $5 billion for practices related to Google Play.**

89.      As previewed above, Google's anticompetitive behavior, grounded in its voracious appetite for profit derived from its Android ecosystem, recently led to a €4.34 billion, or $5.1 billion, fine from the European Commission.[87]

90.      As the Commission explained, Google bought "the original developer of the Android operating system [in 2005] and has continued to develop Android ever since."[88] "When Google develops a new version of Android it publishes the source code online." But

> [t]he openly accessible Android source code covers basic features of a smart mobile operating system . . . not Google's proprietary Android apps and services. Device manufacturers who wish to obtain Google's proprietary Android apps and services need to enter into contracts with Google, as part of which Google imposes a number of restrictions. Google also entered into contracts and applied some of these restrictions to certain large mobile network operators, who can also determine which apps and services are installed on devices sold to end users.[89]

91.      Thus, a manufacturer of an Android OS smartphone or tablet must obtain a license from Google to pre-load popular Google apps including YouTube,[90] Google Maps, Gmail, and Google Play, among others, all of which come bundled in a take-one/take-all suite.[91] Google knows that buyers of Android OS devices expect to see popular Google apps such as YouTube and Google Maps pre-loaded onto their phones and tablets at the expense of competing Android apps. This bundling practice, which is not grounded on any technical need, ensures an enormous and growing

---

[87] *See* http://europa.eu/rapid/press-release_IP-18-4581en.htm (last accessed Aug. 15, 2020).

[88] *See* n. 68, *supra*.

[89] *Id.*

[90] Consumers want and expect the YouTube app on their Android OS devices. In fact, a 2013 study confirmed that smartphone users prefer to view video with apps such as the YouTube app versus viewing via their browsers (*i.e.*, by browsing to the YouTube website and viewing video there). ("Do Smartphone Users View Video with YouTube App or Browsers?" dated March 29, 2013, available at: http://www.brighthand.com/news/study-do-smartphone-users-view-video-with-youtube-app-or-browsers/ (last accessed Oct. 21, 2020).)

[91] *See, e.g.*, "The best of Google, right on your devices—Google Mobile Services brings Google's most popular apps and APIs to your Android devices," available at: https://www.android.com/gms/ (last access date cited above).

base of Google Play installations and users to the detriment of app developers, who are unable to have their apps pre-installed and are therefore funneled into Google Play and at the mercy of Google's arbitrary terms and fees. It also reinforces the notion that Google Play is the official Android store, even though competing app stores could serve their needs equally well—if Google didn't unfairly shut them out of the market.

92.     As the European Commission's findings illustrate, Google's aggressive use of GMS, including Google Play; its refusal to distribute competing app store clients via Google Play; and its anti-fragmentation terms, which have the effect of depressing forked Android OS system distribution, thereby further inhibiting the distribution of competing app stores (such as Amazon's Fire OS and Appstore), have led to its 90%+ share of the market for Android OS app distribution.[92] As none of Google's management is either technically or economically necessary, it is plain that Google has maintained monopoly power in the market through anticompetitive means, which has enabled it to maintain the supracompetitive 30% transaction fee that it charges developers on Google Play app and in-app product sales.

**2.      Google has used anticompetitive contracts with device manufacturers.**

93.     Previously leaked copies of Google's contracts with device manufacturers, called MADAs, provide details of Google's abusive market manipulation. Upon information and belief, the same or similar contracts, or those with the same intent or restrictions, remain in use today.[93]

94.     If a smartphone or tablet manufacturer such as Acer, Samsung, or HTC wishes, for example, to pre-load Google's popular and exclusive YouTube app on a given Android OS phone or tablet, then Google requires that the manufacturer agree via its MADA to pre-load Google Play on

---

[92] *See id.*

[93] *See* https://www.einfochips.com/blog/how-to-obtain-googles-gms-license-for-android-devices/# (current website of company providing Android compatibility services to entities who want to deploy Google's GMS suite and have already obtained a prospective MADA from Google) (last accessed Aug. 15, 2020).

the device as well. This results in a tremendous advantage for Google in that yet more devices will carry its store client to the exclusion of competing apps and store clients.[94]

95.     Additionally, such a manufacturer must agree via this contract that it will pass a so-called Android Compatibility Test as to that device, which Google administers and controls in its sole discretion.[95] This ties to Google's restraint on the production of devices using Android forks as their operating systems,[96] which in turn restricts avenues for distribution of competing app-store clients, as discussed herein.[97]

96.     Plaintiffs do not yet have sufficient information to identify all other manufacturers beyond Acer, Samsung and HTC that have, or have had, MADAs with Google containing these

---

[94] But Google is still not satisfied. In fact, Google Play competitors have faced other anticompetitive behavior by Google. In 2014, for example, a Portuguese firm operating a much smaller app store than Google Play filed an antitrust complaint with the European Commission regarding Google's anticompetitive practices in the app store field. (*See, e.g.*, http://online.wsj.com/ articles/google-faces-fresh-antitrust-complaint-in-europe-1402941192 (last accessed Aug. 15, 2020).) According to *The Wall Street Journal*, "Aptoide claim[ed] that Google creates obstacles for users to install third-party app stores onto its Android platform, bundles services that are essential to its operating system with Google, and blocks access to Aptoide websites in its Chrome Web browser." (*Id.*)

Aptoide won an antitrust injunction against Google, as detailed below. (*See* ¶ 124, *infra*.)

[95] *See* **Ex. A** hereto (MADA between Google and Samsung), ¶¶ 2.1 ("Devices may only be distributed if all Google Applications (excluding any Optional Google Applications) authorized for distribution in the applicable Territory are pre-installed on the device, unless otherwise approved by Google in writing."), 2.7 ("The license to distribute Google Applications in Section 2.1 is contingent upon the Device becoming an Android Compatible Device."), 3.4 (providing that "Google Phone-top Search must be set as *the default search provider for all search access points on the Device* providing for the prime placement of Google Applications" (emphasis added) and also providing for the prime placement of "Google Applications"), 3.8(c) ("Company shall configure Network Location Provider to be the default network-based location provider on all Android Compatible Devices."); **Ex. B** hereto (MADA between Google and HTC), ¶¶ 2.1 (same as ¶ 2.1 in Google-Samsung agreement), 2.7 (same as ¶ 2.7 in Google-Samsung agreement), 3.4 (same as ¶ 3.4 in Google-Samsung agreement), 3.8(c) (same as ¶ 3.8(c) in Google-Samsung agreement).

[96] For example, the House Report notes that "[i]n 2012, Chinese tech giant Alibaba developed a mobile OS called Aliyun for the Chinese market. However, Acer, Alibaba's hardware partner, abruptly canceled its collaboration with Alibaba before the launch of Acer's device running the OS." Reports indicate that Acer's abrupt cancellation was due to threats from Google. House Report at 106 and n.568.

[97] *See* ¶¶ 47-50, 66.

specific (or functionally equivalent) terms. But the Joint Submission of Corrected Exhibit List submitted in a matter called *Oracle v. Google* lists MADAs between Google and a who's who of Android OS device manufacturers, including LG and Sony.[98] Unfortunately, these MADAs are not available for public inspection because they were not entered into evidence in the case. It appears likely, however, that Google has insisted on similar arrangements with some or all of these other manufacturers, in violation of federal and state law, and to the detriment of competition and consumers.

97.     Furthermore, Google also currently provides a long list of brands whose devices are equipped with the GMS suite (including, of course, Google Play).[99] As alleged herein, Google requires entry into a MADA or MADA-like contract to license GMS.

98.     Because of Google's secrecy, Plaintiffs are unaware as to whether MADAs as such, or updated versions, continue to be the specific operative documents between Google and manufacturers. But plainly Google continues to bundle its apps, including Google Play, into a suite (the GMS suite) for U.S. distribution, and plainly they can only be licensed by contract.[100]

99.     Google is violating antitrust and unfair competition law because of the importance of its Google Play client. Google uses its MADAs or similar contracts to restrain and quash competition in the Android OS app distribution market. There is no lawful reason to compel manufacturers wishing to pre-load the YouTube or Google Maps app onto a device, to pre-load Google Play as well. These restraints give Google a *de facto* monopoly because most users will not know how to, or will not, sideload an alternative app store onto a phone (if they even know that is a possibility).

---

[98] *See Oracle America, Inc. v. Google Inc.* (N.D. Cal. No. 3:10-cv-03561), ECF No. 923 at entries 83-85, 286, 2742-56, and 2772-93.

[99] *See* https://www.android.com/certified/partners/ (last accessed Aug. 15, 2020).

[100] *See* https://www.android.com/gms/ (referring to Google Mobile Services (GMS)—"a collection of Google applications and APIs that help support functionality across devices.") (last accessed Aug. 15, 2020). As Google puts it, "While the Android Open Source Project (AOSP) provides common, device-level functionalities such as email and calling, GMS is not part of AOSP. GMS is only available through a license with Google and delivers a holistic set of popular apps and cloud-based services. . . ." (*Id.*) Further, Google "ask[s] GMS partners to pass a simple compatibility test and adhere to [its] compatibility requirements for their Android devices. . . ." (*Id.*)

Google's practice is a pure power play designed to maintain and extend its monopoly in the Android OS app distribution market. Its aim, of course, is to impose its super-high 30% transaction fee on developers who have no choice but to pay it.

**G.     Google's Practices with Respect to Google Play Further Restrain and Injure Competition in the Market for U.S. Android OS App Distribution.**

100.     Google restricts competition in the app distribution market by including terms and conditions in its contracts with app developers that limit consumers' access to competing app stores.

101.     *First*, Google prohibits any app developer that wants to distribute its apps through the Play Store from also distributing any competing *app store* through the Play Store. Although this would be a logical and effective way to distribute app stores—which are themselves mobile apps— Google prohibits this distribution method to maintain its monopoly in the app distribution market.

102.     Google imposes this restraint through provisions of the Google Play Developer Distribution Agreement ("DDA"), which Google requires all app developers to sign before they can distribute their apps through the Play Store. Each of the Defendants is a party to the DDA.

103.     Section 4.5 of the DDA provides that developers "may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates this requirement. The DDA is non-negotiable, and developers that seek access to Android users through the Play Store must accept Google's standardized contract of adhesion. The House Subcommittee reported developers' allegations that Google has used "rule violations as a pretext for retaliatory conduct," and that "challenging a Play Store decision is like navigating a black box," because Google does not explain its determination that a rule violation supposedly occurred.[101]

104.     As discussed above, Google's anticompetitive restrictions in its contracts with device manufacturers discourage device manufacturers and app developers from pre-installing any competing app stores on Google Android smart mobile devices. Further, Google discourages mobile

---

[101] House Report at 222.

device users from installing app stores or even apps through misleading warnings and cumbersome processes (discussed *infra*). Thus, by prohibiting app developers from distributing app store apps through the Play Store, Google has effectively foreclosed any alternative. Without these restrictions, users could download competing app stores, which would lead to increased competition, more consumer choice, and lower prices.

105.     *Second,* Google binds app developers to the Play Store by closing off critical advertising venues to app developers that do not publish their Android apps in the Play Store. Google markets an app advertising program that includes placement on must-have advertising space, including Google Search and YouTube. But this advertising is accessible only to app developers that publish their app in the Play Store (or, for iOS developers, in Apple's App Store). This limitation restricts competition by discouraging app developers from developing apps that are not distributed through the Play Store.

### 1.     There are high barriers to entry into the market for Android OS app distribution.

106.     Google's unlawful monopolistic practices restrain and injure competition in the Android app distribution market, where already there are high barriers to entry.[102] A market-participant hopeful must have the resources to: (1) build and maintain the app store client, (2) program and maintain the requisite software and algorithms going forward, (3) advertise the client and the steps needed to install it, (4) keep the marketplace safe, and (5) process payments at a high volume.

107.     Google keeps the barriers high by refusing to permit distribution of alternative app store clients via Google Play, which is pre-installed on most Android OS devices by default thanks to Google's GMS bundling practices. It also keeps them from gaining users by distribution with Android forks, by way of its exclusionary Android anti-fragment terms.

---

[102] *See also* ¶¶ 54-55, 60, *supra*.

108.    The European Commission also has concluded that there are high barriers to entering

the market for Android OS app distribution.[103] The same factors it cited as high barriers to entry in

"the worldwide market (excluding China) for licensable smart operating system," where Google's

Android OS was estimated in 2018 to have "a market share of more than 95%," apply as well with

respect to entry into the U.S. market for Android OS app distribution:

> There are high barriers to entry in part due to network effects: the more
> users use a smart mobile operating system, the more developers write
> apps for that system – which in turn attracts more users. Furthermore,
> significant resources are required to develop a successful licensable
> smart mobile operating system.[104]

**2.    Google manipulates security fears to maintain and further its market power in U.S. Android OS app distribution.**

109.    But Google does not depend solely on high barriers to entry in the app distribution

marketplace. Instead, Google actively manipulates security fears to maintain and further its

monopoly in U.S. Android OS app distribution.

**a.    Google steers consumers to Google Play by scaring them away from alternative sources for Android OS apps.**

110.    It isn't enough for Google that Google Play is pre-installed on hundreds of millions of

devices, such that it offers ready access to millions of apps[105]—Google also steers consumers away

---

[103] *See* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm. (*Id.* ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices. This market is also characterized by high barriers to entry. . . .").) Further, while Plaintiffs' complaint is not based on Google search dominance, nonetheless, Google search is germane because Google Play is bundled with Google search products, which has aided in achieving Google Play's monopoly status in the U.S.

[104] *Id.*

[105] https://www.statista.com/statistics/266210/number-of-available-applications-in-the-google-play-store/ ("The number of available apps in the Google Play Store was most recently placed at 2.96 million apps in June 2020, after surpassing 1 million apps in July 2013.") (last accessed Aug. 15, 2020).

from all alternative app stores by issuing security warnings from the official Android website.[106] The message is that Google Play is safe and protects users; other app stores are very risky, and to be avoided. In its "Download apps to your Android device guidance," Google writes:

- You can download free and paid apps from Google Play on your Android Phone. We recommend that you get apps from Google Play. You can also get them from other sources.

- Your phone has a security setting (*Google Play* Protect) that checks for potentially harmful apps, warns you, and removes apps if necessary. Learn how to help protect against harmful apps.

- Download apps from other sources

    **Important**: If you download apps from unknown sources, your device and personal information can be at risk.

        - Your phone could get damaged or lose data.

        - Your personal information could be harmed or hacked.

    - Help Google protect against bad apps from other sources

        If you install apps from outside of Google Play, your phone can send Google information about those apps.

        This information helps Google better protect everyone from harmful apps. The information can include log information, URLs related to the app, device ID, Android version, and IP address.[107]

111.    Google issues these warnings indiscriminately. Like Google Play, the Amazon Appstore is monitored and curated.[108] But according to Google, it's still too risky to use (assuming the consumer even knows about it). These warnings ring hollow, however, for Google Play itself has

---

[106] https://support.google.com/android/answer/7391672?hl=en&ref_topic=7311596 (last accessed Aug. 15, 2020).

[107] *Id.* (emphasis added).

[108] *See, e.g.*, "Amazon Appstore Content Policy," available at: https://developer.amazon.com/docs/policy-center/understanding-content-policy.html (last accessed Aug. 15, 2020).

proven vulnerable to malware that could harm consumers.[109] Google will not permit distribution of alternative app-store clients via Google Play on the false premise that it is too risky for consumers.

112.    To become a viable app store, a market hopeful must find a way to persuade Android device owners to sideload the client onto their phones or tablets—after first making a sizeable number of users aware of its existence. This is no easy task. Users must take obscure and unnecessary steps to access other app stores because Google has made it difficult in order to protect its monopoly power in Android OS app sales. Google will not permit distribution of alternative app-store clients via the *de facto* Google Play acquisition and installation method because it falsely claims that it would be too risky for consumers if it did.

113.    In its "Understanding Android" piece, Google states as "Android Fact #12"[110]: "Because third-party stores don't always adhere to the strict Google Play Store security checks for apps, Google Play doesn't allow other app stores to be downloaded directly through the Play Store. . . ." But this self-serving justification does not withstand scrutiny.

114.    *First*, Google offers no explanation for shutting out *all* app-store clients from Google Play, including those run by well-resourced companies such as Amazon or Samsung. Further, Google could scrutinize each app-store client as it does other apps before allowing it into Google Play.

115.    *Second*, Google itself touts initiatives to safety-check and even quarantine or delete *all* apps on Android OS devices, wherever they are obtained. For example, in its February 2016 white paper titled, "How we keep harmful apps out of Google Play and keep your Android device safe,"[111] Google states:

> Even though we do a lot of work to make Google Play apps safe before they reach you, Google works hard to protect you—no matter where your app comes from. We sandbox each application to constrain bad

---

[109] *See, e.g.*, "Android security: Malicious apps sneak back into Google Play after tweaks," May 9, 2018, available at: https://www.zdnet.com/article/android-security-malicious-apps-sneak-back-into-google-play-after-tweaks/ (last accessed Aug. 15, 2020).

[110] https://www.android.com/everyone/facts/ (last accessed Aug. 15, 2020).

[111] This white paper was linked from the Understanding Android piece cited in paragraph 113 of this complaint.

behavior and if an app wants new permissions, we ask you to confirm at runtime.

In addition to multiple layers of security built into the platform, Android also includes a feature called Verify Apps. Verify Apps continually scans for potentially harmful apps. If an app is discovered later to be potentially harmful, Verify Apps will disable the app and request for you to remove it.

Verify Apps also checks apps you install from outside of Google Play. If we see an app that looks malicious, we warn you before the installation proceeds. Verify Apps is available on every Android device (2.3+) that has Google Play installed.[112]

116.    As for its more security regime, Google Play Protect, Google assures:

Google Play Protect helps you keep your device safe and secure.

- It runs a safety check on apps from the Google Play Store before you download them.

- It checks your device for potentially harmful apps from other sources. These harmful apps are sometimes called malware.

- It warns you about any detected potentially harmful apps found, and removes known harmful apps from your device.

- It warns you about detected apps that violate our Unwanted Software Policy by hiding or misrepresenting important information

- It sends you privacy alerts about apps that can get user permissions to access your personal information, violating our Developer Policy.[113]

117.    If these assurances are to be believed, then Google already monitors the security of all apps that would be obtained from any competing app store. These assurances, therefore, alone or coupled with the vetting that Google already performs before releasing any app in Google Play, undercut Google's stated reason for keeping all competing app-store clients out of Google Play.

---

[112] https://docplayer.net/15116445-How-we-keep-harmful-apps-out-of-google-play-and-keep-your-android-device-safe.html at 4 (last accessed Aug. 15, 2020).

[113] https://support.google.com/android/answer/2812853?p=playprotect_download&hl=en&visit_id=636801711322579028-4051903200&rd=1 (last accessed Aug. 15, 2020).

1

**3.      Google's refusal to permit app-store clients into Google Play means that only a hardy few will attempt installation of alternative stores.**

2

118.     By keeping other app-store clients out of Google Play, and by scaring potential users,

3

4

Google assures that only a hardy few will ever attempt to load another app store front onto their

5

Android OS devices.[114]

6

119.     The following is an example of the steps Android device consumers must take if they

7

wish to do so—assuming they ever learn of the alternative store's existence, and assuming they

8

consider themselves technically savvy enough to try. To access the Amazon Appstore, consumers

9

must first obtain a link from an Amazon website. Then the consumer must do the following:

10

11

12

13



14

15

16

17

Step 1

18

Download Amazon Appstore

1.  Use link sent to you in email to navigate to the Amazon Appstore download page

19

2.  Tap on "Get Amazon Appstore" button

3.  Follow instructions

20

21

22

23

24

25

26

27

28

---

[114] For example, the House Report notes that "Google has created significant friction for sideloading apps to Android devices" and that "[o]ne developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading." House Report, at 97.



Step 2

Enable Unknown Sources

1.  In your phone Settings page, tap on "Security" or "Applications" (varies with device)
2.  Enable "Unknown Sources" permission
3.  Confirm with "OK"

Step 3

Install and Launch Amazon Appstore

1.  In your device's "Download" folder, find and tap on the "Amazon_app.apk" file
2.  Tap "Install" on the Android Installer screen
3.  Launch the Amazon Appstore[115]

---

[115] https://www.amazon.com/gp/feature.html/ref=sxts_snpl_1_1_b122686d-95c7-451e-a41b-8f08ca46cdcb?pf_rd_p=b122686d-95c7-451e-a41b-8f08ca46cdcb&docId=1000626391&pf_rd_r=ZSYBJ5ZEY4SCVPB0YXB5&pd_rd_wg=Ou2nJ&pd_rd_w=l6Ci1&qid=1597568508&pd_rd_r=1f985501-51cf-4e11-8fdc-4d076ac56dbb (last accessed Aug. 15, 2020).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

120.     Because of Google's refusal to allow competitors to distribute app-store clients via Google Play, and because of Android's security features—whose configuration Google controlled as the leader of the AOSP—consumers wishing to install an alternative app store had to be willing to turn on the "Unknown Sources" permission referenced in Amazon's Step 2 above. In Android versions released before the Oreo variant, the user first had to find a screen looking like this:



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

121.   Then, if she opted to turn the switch to the right, she would be greeted with this ominous warning:



If she dared to leave the "Unknown sources" toggle to the on position, she would then have opened her device to all sorts of vulnerabilities — all because she wanted to use another app store to buy apps that might be cheaper than the purchase price in Google Play.

122.   As of Android 8.0, code-named Oreo, Google has changed the permissions structure so that users can authorize downloads from only one source at a time.[116] It is believed, and therefore

---

[116] (https://www.android.com/versions/oreo-8-0/ ("Hostile downloader apps can't operate without permission; users now permit the installation of APKs per-source.") (last accessed Aug. 15, 2020).) Oreo was not released to the public until August 21, 2017. (https://android-developers. googleblog.com/2017/08/introducing-android-8-oreo.html (last accessed Dec. 10, 2018).) As of October 26, 2018, well over a year later, Oreo's worldwide install base was at a mere 21.5%, not counting China. (https://developer.android.com/about/dashboards/ (last accessed Dec. 10, 2018).)

alleged, that many Android OS devices in operation today still run on pre-Oreo Android versions, with their scary app permission toggle and warning. But even with the change brought with Oreo, Google knows and intends that most device users will not know how to access stores and apps outside of Google Play, and Google knows and intends that they still will be frightened away by having to change a permission switch, given its continued warnings in various guises. For example, users who wish to sideload might see this warning (after first receiving a pre-warning): "Your phone and personal data are more vulnerable to attack by unknown apps. By installing apps from this source, you agree that you are responsible for any damage to your phone or loss of data that may result from their use."[117] Google issues this alarmist message no matter how reputable the store operator (or other developer), thus belying the notion that Google is protecting anything other than its monopoly with these scare tactics.[118]

**4. Even if a consumer succeeds in loading an alternative app-store client onto his or her device, Google may try to shut down access, which harms competition and developers.**

123. If all else fails—if a consumer learns of another app store, figures out how to acquire the client, educates herself on how to install it, and steels herself against Google's dire security warnings, Google may attempt to shut down the consumer's access. Aptoide is a competing Android OS app provider.[119] As such, Google has denied it distribution via Google Play.

124. Google forced Aptoide to go to court to seek an antitrust injunction for sweeping up its distribution app in its Google Play Protect sweeps. And Aptoide won. According to Aptoide's press release:

---

[117] "Android Q currently disables 'Install unknown apps' permission after every use," available at https://9to5google.com/2019/04/04/android-q-install-unknown-apps/ (last accessed Aug. 17, 2020).

[118] And even if users overcome the hurdles imposed by Google and download an app from outside the Play Store, the app may be subject to removal from the user's mobile device by Google's security systems, such as Google Play Secure, and experience problems updating the apps.

[119] http://www.aptoide.com/.

**EU National Court rules against Google in Anti-Trust process**

*Lisbon, October 19th, 2018*

The Portuguese Courts issued today a decision against Google in relation to the injunction filed by Aptoide. It is applicable on 82 countries including UK, Germany, USA, India, among others. Google will have to stop Google Play Protect from removing the competitor Aptoide's app store from users' phone without users' knowledge which has caused losses of over 2.2 million users in the last 60 days.

The acceptance of the injunction is totally aligned with Aptoide's claim for Google to stop hiding the app store in the Android devices and showing warning messages to the users. Aptoide is now working alongside its legal team to next week fill in courts the main action, demanding from Google indemnity for all the damages caused.

This action is part of a complaint against foul play by Google, directed to Android's antivirus software, Google Play Protect. Google's anti-malware system was wrongly identifying Aptoide as a potentially malicious app, hiding and uninstalling it from Android smartphones without user consent.

Aptoide, with over 250 million users, 6 billion downloads and one of the top stores globally, also presented last July, a formal complaint to the European Union's anti-trust departments against Google.

Paulo Trezentos, Aptoide's CEO, says that "For us, this is a decisive victory. Google has been a fierce competitor, abusing his dominant position in Android to eliminate App Store competitors. Innovation is the reason for our 200 million users base. This court's decision is a signal for startups worldwide: if you have the reason on your side don't fear to challenge Google."

According to Carlos Nestal, head of the legal team that worked in the case:

"This case, to our knowledge, is the first of an EU national Court that enforces a clear separation of Android layer and the Services layer. Court is clearly stating that Google's control of the Operating System cannot be used as a competitive advantage in the Services market. We believe this may apply to other situations where Google has competition."[120]

---

[120] Press release available at, *inter alia*: https://www.androidpolice.com/2018/10/23/aptoide-gains-injunction-google-latest-antitrust-case-compensation-follow/ (last accessed Aug. 15, 2020).

FIRST CONSOLIDATED CLASS ACTION COMPLAINT                                    - 48 -
Case No.: 3:20-cv-05792-JD / 3:20-cv-06772-JD

125.     Reports indicate that Samsung's small app store also was caught up in Google's dubious security net. As androidsage.com reported on June 18, 2018, "[S]ince today, a bunch of Samsung users have reported of Google Play Store flagging the official Samsung Galaxy App Store as potentially dangerous and fake at the extent of even blocking it."[121] This action no doubt resulted in some number consumers fleeing the store rather than risking continued access to it. But for those who wanted to keep it, androidsage.com offered a "temporary fix" for those inclined to disregard Google's warnings.[122]

126.     There is no good reason that a company as technologically sophisticated as Google could not whitelist or otherwise continue to permit unimpeded access to competitors' app stores on Android OS devices, including those run by well-known operators such as Amazon and Samsung. Again, Google is bound and determined to maintain its ill-gotten monopoly market power which allows it to impose its default 30% transaction fee on developer approved in-app product sales.

**H.     Google's unlawful practices harm developers and competition.**

127.     Google's practices in aid of maintaining or attempting to achieve a monopoly in the Android OS app distribution market harm developers and competition by depressing output, stifling innovation, limiting choice, and extracting a supracompetitive 30% tax on every paid app purchased through the Play Store. But for Google's anti-competitive restrictions, app developers would be able to distribute their apps through alternative methods, including by providing apps directly to consumers, selling apps through independent app stores, creating their own competing app stores, or forming business relationships with OEMs which can pre-install apps.

**1.     Google's behavior stifles innovation.**

128.     Google's abusive behavior also stifles innovation in the U.S. market for Android OS app distribution.[123]

---

[121] https://www.androidsage.com/2018/06/18/google-play-protect-blocking-galaxy-app-store-how-to-fix/ (last accessed Aug. 15, 2020).

[122] *See id.*

[123] *E.g.*, Stephen D. Houck, *Injury to Competition/Consumers in High Tech Cases*, St. Johns L. Rev. Vol. 5, Iss. 4, 593, 598 (2001) ("Any assessment of a restraint's anticompetitive impact,

129.     For example, Amazon devised an alternative way of distributing Android OS apps, Amazon Underground, which makes apps and in-app purchases "actually free" to consumers.[124] Amazon pays developers according to how much time consumers spend interacting with the apps.[125] Yet Google's developer terms will not allow Amazon to distribute the client for this app via Google Play (even as Amazon distributes several other apps through the store).[126]

130.     In fact, shortly after Amazon introduced Amazon Underground by integrating it into its larger shopping app, Google changed its developer terms to prohibit distribution of an app store in that manner.[127] This forced Amazon to remove its Appstore from its shopping app—and to lose that promising avenue of distribution.

131.     Surely Google's aggressive, anticompetitive behavior is one reason why Amazon shuttered Amazon Underground in 2019.[128] Industry analysts perceived Amazon's extreme uphill battle from the outset. One put it this way:

> The first issue is scale. For a system like this you need critical mass and scale in terms of audience and content. Amazon's hands were tied because they weren't able to make Underground readily available on iOS (obviously) or Google devices.

---

however, will be incomplete if limited to price and output effects. The restraint's impact on consumer choice and innovation must also be considered.").

[124] *See, e.g.*, "Amazon Underground innovates with free apps but faces challenges," available at https://technology.informa.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Oct. 7, 2015).

[125] *Id.*

[126] *See id.*

[127] *See, e.g.*, "[Update: Confirmed] Google Forced Amazon To Remove Its Main Shopping App From The Play Store Because Of Its Appstore Integration," Dec. 11, 2014, available at: https://www.androidpolice.com/2014/12/11/google-may-have-forced-amazon-to-remove-its-main-shopping-app-from-the-play-store-because-of-its-appstore-integration/ (last accessed Dec. 10, 2018).

[128] *See, e.g.*, "Why is Amazon shutting down its Underground Initiative?" May 9, 2017, available at: https://www.pocketgamer.biz/mobile-mavens/65694/why-is-amazon-shutting-down-its-underground-initiative/ ("It was part of a long-term strategy with bold ambitions to change the way mobile developers made games, but two years on Amazon has announced that Underground will no longer feature on the Amazon Appstore as of Summer 2017, with the program officially ending in 2019.") (last accessed Aug. 15, 2020).

That means they were always going to be limited to those people with Fire devices or who were motivated enough to use more than one app store. . . .[129]

132.    Another analyst put it thus:

**User acquisition is still the biggest challenge**

Amazon's revamped plans offer app publishers an innovative new model for monetizing certain apps but it may not be enough to address its major challenge: how to persuade Android users to download an alternative store to Google Play. . . .

**Strong app store competition**

The app store competition is extremely strong. The Google Play Store offers a catalogue of than more one million apps (far greater than Amazon) and comes preinstalled on almost all Android smartphones outside China. The Google Play store is more than sufficient for most users' needs and Google reported more than 1.4bn active devices in September 2015.

Beyond Amazon's own Fire branded smartphone (now discontinued) and tablets, Amazon's store does not come preinstalled on any devices[130] and so app publishers correctly focus first on providing content for Google's store rather than Amazon's.

To download the Amazon Underground app, as with its previous Appstore for Android, users have to change their Android permissions to enable non-Google Play downloads which is a step too far for most customers. Amazon needs to have its store pre-installed on Android smartphones if it is to drive increased adoption. Smartphone brands that wish to reduce their dependency on Google should be open to such a relationship.

**Other stores are unlikely to follow suit, for now**

Amazon's Underground app program is a response challenging market position. As a challenger store with limited market share, Amazon has to innovate to attract users. It also needs to give developers a reason to provide content for its store. Amazon can offset the costs of running the Underground program by tying its users more closely into its ecosystem and driving retail transactions and other content revenues; Amazon Prime Video and its retail store are available alongside mobile

---

[129] *Id.* (quoting Oscar Clark, "Author, Consultant and Independent Developer Rocket Lolly Games").

[130] This was as of October 2015, when the referenced article was published.

apps in Underground. Market leaders Apple and Google do not struggle to attract users or app publishers and the share they take from app transactions have become significant revenue streams, so there is no incentive for them to adopt a similar program.[131]

133.   And as Google has done what it can to shut out even a well-resourced potential competitor such as Amazon, Amazon itself continues to soldier on by way of its Amazon Coins program, which allows consumers to buy apps at a discount in the Amazon Appstore.[132] For example, on Aug. 15, 2020, the popular game Minecraft for Android OS was priced at the same nominal sum of $6.99 in both Google Play and the Amazon Appstore.[133] But by using Amazon Coins, a purchaser could save 20%, bringing her price to approximately $5.59:

Minecraft

by Mojang

Rated: Guidance Suggested

*4.4 out of 5 stars* 83,176 customer ratings

Price: **$6.99**

*Save up to 20%* on this app and its in-app items when you purchase **Amazon Coins**. Learn More

Sold by: Amazon.com Services LLC.[134]

---

[131] *See* "Amazon Underground innovates with free apps but faces challenges," Oct. 7, 2015, available at: https://technology.ihs.com/550085/amazon-underground-innovates-with-free-apps-but-faces-challenges (last accessed Aug. 15, 2020).

[132] Amazon's presumptive revenue split in its own Appstore is also 70% developer / 30% store operator, as with Google and Apple. On the other hand, its Amazon Coins program allows consumers to save money on the purchase price of apps everyday while developers continue to earn their 70% developer share. (*See* https://www.amazon.com/dp/B018HB6E80/ref=twister_B009CDKIA8?_encoding=UTF8&psc=1#where (explaining Amazon Coins programs and noting: "The More You Buy, the More You Save. Amazon Coins come in denominations from 300 to 50,000 Amazon Coins. Bigger denominations always have bigger discounts. The savings on an order of 50,000 Coins is always larger than on an order of 300 Coins."); https://www.amazon.com/Amazon-Coins-Apps-Games/b?ie=UTF8&node=13927674011 (more on Coins program) (last accessed Aug. 17, 2020).

[133] *Compare* https://play.google.com/store/apps/details?id=com.mojang.minecraftpe (last accessed Aug. 15, 2020) *with*, https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_1?s=mobile-apps&ie=UTF8&qid=1549260798&sr=1-1&keywords=minecraft (last accessed Aug. 15, 2020).

[134] https://www.amazon.com/Mojang-Minecraft/dp/B00992CF6W/ref=sr_1_2?dchild=1&keywords=minecraft&qid=1597603583&s=mobile-apps&sr=1-2 (last accessed Aug. 16, 2020).

134.    Unfortunately, there is no evidence that any of these innovative programs has dented Google's market share to any meaningful degree, which is not surprising considering Google's abusive behavior, including its refusal to permit access via Google Play.

135.    Google's domination of the U.S. app distribution market also stifles innovation in apps—another way it hurts competition generally. Other vibrant app stores would mean more places for featuring apps. With so many apps available on the market, product can and does get lost in Google Play. Developers and competition generally, not to mention individual end-users, would benefit from other venues that would surface good, new products and encourage the development of yet more and better apps—all of which would engender more output in the market here at issue.

**2.      Google harms developers by killing competition and diminishing consumer choice.**

136.    Google's aggressive, anticompetitive behavior diminishes the choice offered by endeavors such as Amazon Underground, which lowered prices (even to zero, with its Actually Free component), while also offering developers another way to earn from their work. If even another corporate giant could not make the model work given Google's policies and the Google Play behemoth, there is little hope for other prospective competitors to gain significant market share unless Google is required to change its contracts and practices.

**3.      Google also harms developers and competition by depressing output.**

137.    Evidence shows that consumers of app-store products are quite price sensitive.[135] Google's high transaction fees, therefore, inhibit sales of products sold via Google Play, which has

---

[135] *See, e.g.*, "The History of App Pricing, And Why Most Apps Are Free," July 18, 2013, available at: https://flurrymobile.tumblr.com/post/115189750715/the-history-of-app-pricing-and-why-most-apps-are ("Conventional wisdom (backed by a variety of non-Flurry surveys) is that Android users tend to be less affluent and less willing to pay for things than iOS users. Does the app pricing data support that theory? Resoundingly. As of April 2013, the average price paid for Android apps (including those where the price was free) was significantly less than for iPhone and iPad apps . . .") (last accessed Aug. 15, 2020); "Only 33% of US Mobile Users Will Pay for Apps This Year," Feb. 5, 2015, available at: https://www.emarketer.com/Article/Only-33-of-US-Mobile-Users-Will-Pay-Apps-This-Year/1011965 ("Put a dollar sign in front of an app, and the number of people who are willing to download and install it drops dramatically. According to a new forecast from eMarketer, 80.1 million US consumers will pay for mobile apps at least once this year, representing only 33.3% of all mobile users.") (last accessed Aug. 15, 2020).

1   the lion's share of the U.S. market for Android OS app distribution.[136] In other words, they depress

2   output. Developers understand that paying Google's high distribution fees denies them the ability to

3   lower prices as they choose, which deters many from investing in app development and distribution.

4   Thus, output is depressed.

5        138.   Furthermore, Google crams too many apps into the Google Play store. With so many

6   apps in one store, consumers cannot discover the vast majority of them. They are lost in the forest.

7   Google's monopoly practices render it impossible to maintain viable alternative stores at any scale;

8   therefore, there are no reasonable alternatives for surfacing good apps elsewhere. Again, because of

9   the way in which Google willfully makes sideloading a non-alternative for the vast majority of

10  consumers, output is depressed by way of the hiding of apps through overcrowding in Google Play.

11       139.   Google's $.99 minimum price for U.S. app sales also depresses output. Google itself

12  recognizes this by way of contractual terms that permit lower minimum prices in 18 other

13  countries[137]: lower prices move more apps. Again, developers lose volume and real money as a

14  result. There is no good or pro-competitive reason to deny them pricing flexibility for minimum-

15  priced apps.

16       **4.   Google harms developers by charging supracompetitive pricing of distribution
           services for Android OS apps and in-app add-ons, including subscriptions.**

17

18       140.   There is no pro-competitive, or otherwise justified reason for the 30% fee that Google

19  charges to U.S. app developers for app and in-app product distribution services, the rate of which it

20  has maintained since the opening of its Android OS app store.[138] Nor is there justification for its 15%

21  distribution-services fee as to certain subscriptions in place for over a year, the rate of which Google

22  began to offer sometime in 2018. In fact, that Google offers the 15% rate for certain subscriptions

23       _____

         [136] *See* ¶¶ 54-55, 60, *supra*.

24       [137] *See, e.g.*, ¶ 40, *supra*.

25       [138] *See, e.g.*, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," Aug. 29,
26  2018, available at: https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/
    ("Apple unveiled the App Store in July 2008, and Android Market the following month, opening
27  with the first Android device that October. Apple set the 30 per cent rate, Google simply followed
    suit.") (last accessed Aug. 15, 2020); *see also* https://support.google.com/googleplay/android-
28  developer/answer/112622?hl=en (last accessed Aug. 15, 2020).

only underscores the supracompetitive nature of Google's default 30% commission rate. This unnatural price stability, under the circumstances alleged herein, including what surely is the accrual of economies of scale and pertinent lower costs for various inputs as time has progressed, is a sure sign of Google's unlawful acquisition of monopoly power and the abuse of that market power. Google immediately imposes this charge on developers by way of its contracts of adhesion.

141.     Nor do the circumstances give rise to any pro-competitive justification for Google's contractual terms requiring $.99 minimum pricing for paid apps and in-app add-ons. This pricing mandate, too, is an abuse of Google's monopoly power.

**30% default transaction fee**

142.     In spite of not having to carry physical inventory (as distinct from a mere bit of digital storage for uploaded content); having such a large and growing pre-install base for the Google Play store, which has multiplied not by building more physical stores but simply by replicating an app; and economies of scale that have grown over time, Google has continued to take from developers nearly a third of every dollar spent as a fee for all covered Google Play transactions. Given how large the market is, there is plainly enough revenue to support app-store functions while providing a healthy profit in the event the 30% transaction fee were lowered to a reasonable rate—one the market could generate on its own but for Google's improperly acquired monopoly in the U.S. market for Android OS app distribution and the historic and ongoing abuses of its market power.

**Epic Games**

143.     In its August 29, 2018 article entitled, "A decade on, Apple and Google's 30% app store cut looks pretty cheesy," *The Register* raised several important points and asked as many hard questions with regard to Google's long-standing fee structure. The impetus for the article was the developer Epic Games' decision to distribute its popular Fortnite game to Android device owners outside of Google Play.[139]

---

[139] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/ (last accessed Aug. 15, 2020). The article's subtitle and URL refer to a "duopoly." There is no duopoly in a legal sense, given the incompatibility between Android OS apps on the one hand and Apple iOS apps on the other.

144.    As reported in the article, Epic's CEO, Tim Sweeney, told *Forbes*[140] that "[a]voiding the 30 percent [Google Play] 'store tax' is a part of Epic's motivation."[141] "It's a high cost in a world where game developers' 70 per cent must cover all the cost of developing, operating, and supporting their games. And it's disproportionate to the cost of the services these stores perform, such as payment processing, download bandwidth, and customer service."[142] In a previous *Register* article, Mr. Sweeney put it this way: "[F]rom the [developer's] 70 percent, the developer pays all the costs, of developing the game, operating it, marketing it, acquiring users and everything else. For most developers that eats up the majority of their revenue."[143]

145.    After noting that one reader of a previous *Register* article had written: "I learned something. Google take[s] 30%. That is some serious gouging," the later article stated: "More pertinently, after a decade, is the question why Apple and Google *still* take a 30 per cent cut. In a competitive marketplace, wouldn't that rate have been whittled down over the years?"[144] Indeed.

146.    While the scale of Epic's own endeavor—not only the sale of Fortnite outside of Google Play, but a new game store for Android OS device owners—will be small compared to

---

[140] *See* "From 'Fortnite' To 'Fallout 76,' Publishers Are Sick Of Google, Apple and Steam's Store Cuts, Aug. 13, 2018, available at: https://www.forbes.com/sites/insertcoin/2018/08/13/from-fortnite-to-fallout-76-publishers-are-sick-of-google-apple-and-steams-store-cuts/#1c118ff2578c (last accessed Aug. 15, 2020) ("Epic announced that Fortnite would indeed be coming to Android, but it would not be sold through the Google Play store. Players would have to (somewhat clunkily) download it from Epic's website on their phones, and the game would then update itself independently of the Play store going forward.").

[141] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/.

[142] *Id.*

[143] "Game over for Google: Fortnite snubs Play Store, keeps its 30%, sparks security fears, Aug. 3, 2018," Aug. 3, 2018, available at: https://www.theregister.co.uk/2018/08/03/fortnite_security_fears/ (last accessed Aug. 15, 2020). The security fears of which the article also speaks could be avoided if Google Play permitted the distribution of alternative game-store clients through Google Play.

[144] https://www.theregister.co.uk/2018/08/29/app_store_duopoly_30_per_cent/. The piece goes on to note that Amazon's Appstore might be considered "fairly shabby" today, but points out that it might not remain so "if it could provide incentives to app developers to submit apps[.]" (Citation omitted). "Submitting to more than one app store has a very low marginal cost to the developer, so this would make a good proof point for any remedy." (Citation omitted.)

Google Play, its owners have provided information illustrating the supracompetitive nature of Google's 30% transaction fee. For their own store, Epic will employ a *12%* transaction fee.

147.    This is plenty to achieve a reasonable profit, as explained by Epic's CEO. Per an *MCV* article entitled, "New Epic Games Store takes on Steam with just 12% revenue share – Tim Sweeney answers our questions"[145]:

> "While running Fortnite we [Epic] learned a lot about the cost of running a digital store on PC. The math is quite simple: we pay around 2.5 per cent to 3.5 per cent for payment processing for major payment methods, less than 1.5 per cent for CDN costs (assuming all games are updated as often as Fortnite), and between 1 and 2 per cent for variable operating and customer support costs." Sweeney told us.

> "Fixed costs of developing and supporting the platform become negligible at a large scale. In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent," he reveals. "But with developers receiving 88 per cent of revenue and Epic receiving 12 per cent, this store will still be a profitable business for us," he explains.[146]

148.    That a newcomer like Epic can run a store profitably with a 12% fee demonstrates how supracompetitive Google's 30% transaction fee truly is. Given Google's experience, huge pre-installation base for Google Play, and its other economies of scale, it's likely that Google could earn a healthy profit by charging even less than 12% per covered transaction.

149.    Notably, Epic's CEO indicates above that the rates are "around 2.5 percent to 3.5 percent . . . for major payment methods." Yet Google charges 30% as its Google Play default rate for in-app purchases (with some subscription rates at 15%, as referenced herein). And this matters deeply to Android developers. The ability for consumers to pay in-app is critical to app developers, who may otherwise forego purchasing app add-ons if they cannot readily do it with the developer's app.[147]

---

[145] https://www.mcvuk.com/business/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions (dated Dec. 4, 2018) (last accessed Aug. 15, 2020).

[146] *Id.*

[147] Complaint for Injunctive Relief, *Epic Games, Inc. v. Google, et al.*, No. 20-cv-05671 (N.D. Cal.), filed Aug. 13, 2020, ECF No. 1, ¶ 134.

150.     Epic has repeatedly tried to do something about this monopolist-imposed rate, to no avail. In fact, Epic recently tried to offer a lower rate to consumers for virtual currency in its popular Fortnite app for Android, which is distributed via Google Play.[148] Epic offered consumers a choice: pay through Google's payment processing system, or pay 20% less through Epic's.[149] Within hours, Google, in an exercise of its enormous market power, responded by kicking Fortnite out of Google Play.[150]

151.     Epic responded by filing suit against Google later that day. Epic's complaint includes Sherman Act monopolization claims and state claims as well. It seeks injunctive relief against Google.[151]

**Chrome Web Store**

152.     Another comparator comes from Google itself. Google has for years operated the Chrome Web Store, whereby it sells certain apps for use on computers, such as Windows laptops and desktops.[152] Google's transaction fee for purchases of paid apps or in-app products is only 5%,[153] a mere fraction of Google Play's 30%. There is no indication that the Chrome Web Store is an eleemosynary venture, or that Google is losing money by way of transaction fees set at 5%.

153.     Tellingly, however, when so-called ARC apps are concerned, the fee goes up to 30% for in-app (and one-time[154]) payments. ARC stands for App Runtime for Chrome, which is a Google

---

[148] *Id.* ¶ 28.

[149] *Id.*

[150] *Id.* ¶ 29.

[151] *Id.* ¶¶ 135-238.

[152] *See* https://chrome.google.com/webstore/category/extensions (last accessed Aug. 15, 2020).

[153] https://developer.chrome.com/webstore/pricing#seller ("Each time someone buys your app using Chrome Web Store Payments, Google charges you a 5% transaction fee. For example, if you charge $1.99, you'll receive $1.89; if you charge $9.99, you'll receive $9.49.") (last accessed Aug. 15, 2020); https://developer.chrome.com/webstore/money (same transaction fee for in-app payments when using the Chrome Web Store API) (last accessed Aug. 15, 2020).

[154] This is evidently equivalent to charging some amount for the app itself. (*See* n. 155, *infra*.)

project introduced in 2014 to bring Android apps to devices running Google's Chrome OS.[155]
According to Google:

> **Note:** In-app payments for ARC apps are subject to a 30% transaction fee. For example, if you charge $1.99 for an item offered in an ARC app, you'll receive $1.39. *This is to ensure a consistent pricing structure with in-app payments made in apps available on Google Play.* ARC does not currently support other purchase models including up-front payments, subscriptions and in-app version upgrades; as these types of purchases require provisioning from Google Play which is not currently enabled. . . .[156]

In other words, Google *could* charge much less, but maintains the 30% Google Play fee for internal "consistency" reasons.

### Minimum pricing

154.    The minimum price fixing that Google requires via its adhesive developer contract likewise is unlawful. Low-price apps sell especially well, but the developer contract will not allow regular pricing in the U.S. to fall below $.99, to the detriment of developers who must forego volumes of lower-price sales.

## VI.    INTERSTATE TRADE AND COMMERCE

155.    The activities of Google as alleged in this complaint were within the flow of, and substantially affected, interstate commerce. Google Play sells distribution and payment-processing services across, and without regard to, state lines.

## VII.    RELEVANT MARKETS

### First relevant market

156.    The antitrust injuries alleged herein, including harm to developers and competition, have occurred in the U.S. market for distribution of Android OS apps, *i.e.*, for distribution services

---

[155] "First set of Android apps coming to a Chromebook near you," Sept. 11, 2014, available at: https://chrome.googleblog.com/2014/09/first-set-of-android-apps-coming-to.html (last accessed Aug. 15, 2020).

[156] https://developer.chrome.com/webstore/money (last accessed Aug. 15, 2020).

provided to U.S. Android app developers.[157] This market is heavily dominated, to the point of monopoly status, by Google, including by way of its Google Play store, thanks to Google's willful and anticompetitive behavior as described in this complaint. As the European Commission has found, Google and Google Play, via various anticompetitive practices, have acquired some 90 percent of the market worldwide in Android app distribution.[158] There is no reason to believe that Google's share is less than that in the U.S. Accordingly, Google's share of the relevant market for Android app and in-app distribution services is believed, and therefore alleged, to have reached a similar level of dominance.

157.    Competitors in the relevant market exist, such as Amazon, Aptoide, and Samsung, but they are weak in terms of their own market power. Google has "cut off the air supply" of each such competitor by its unlawful contracts, policies, and actions.  None has made a serious dent in Google's market share.

158.    Furthermore, due to the incompatibility of Apple's iOS with Google's Android OS, and the resultant incompatibility of iOS and Android OS apps; due to Google's status as a bottleneck retailer; and due, *inter alia*, to the high switching costs among end users, as well as plaintiffs and putative class members, Apple's App Store and corresponding distribution services for iOS apps offers no competition to, and is not a substitute for, Google's distribution services for Android OS apps. Developers, industry, and governments understand that the Android market alleged herein is a discrete one, which Google monopolizes.

159.    For the reasons alleged herein, including the foregoing, the relevant market is a single-brand market or, alternatively, a submarket of a larger market that includes, *inter alia*, other mobile OS app distribution services.

---

[157] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

[158] *See* European Commission, *Google Android*, Case AT 40099, Commission Decision of 18 July 2018, at 92-97, available at https://ec.europa.eu/competition/antitrust/cases/dec_docs/40099/40099_9993_3.pdf (last accessed Aug. 17, 2020).

160.     Google's restraints on competition directly impact the U.S. market for Android OS distribution services as alleged herein. Google permits and encourages U.S. app developers to sell their apps via Google Play to non-U.S. nationals, and U.S. developers (including the Plaintiffs) do so.  Upon information and belief, these developers' business relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S. entities. Therefore, the Foreign Trade Antitrust Improvement Act does not apply. Alternatively, its exceptions apply, including because the conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations.

161.     Google is a direct seller of distribution services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[159]

162.     Plaintiffs seek relief on behalf of themselves and other developers. Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers. To the contrary, Google does not share its transaction fees with consumers. Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

163.     *Alternatively*, the antitrust injuries alleged herein, including harm to developers and competition, have occurred in the U.S. Android app distribution market. This market includes the Play Store, other app stores for Google Android devices, such as Samsung's Galaxy Apps store and the Amazon AppStore, and independent app stores, such as Aptoide. It also includes app stores for non-Google ("forked") Android devices, such as the app store Amazon developed for its own Android OS (Fire OS).

---

[159] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020). The Google Play mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

164.    The relevant market does not include app stores for non-Android smart mobile OSs such as the (now defunct) Windows Mobile Store (compatible only with Microsoft's Windows Mobile OS) or Apple's App Store (compatible only with iOS), because app stores are OS-specific. A consumer who owns an Android smartphone cannot use an app store developed for a non-Android OS, and a device manufacturer that pre-installs an app store on an Android device cannot install an app store that runs on a non-Android OS.

165.    Due to the incompatibility of Apple's iOS with Google's Android OS, and the resulting incompatibility of iOS and Android OS apps; due to Google's status as a bottleneck retailer; and due, *inter alia*, to the high switching costs among end users, as well as Plaintiffs and putative class members, Apple's App Store and corresponding distribution services for iOS apps offers no competition to, and are not a substitute for, Google's distribution services for Android OS apps. Developers, industries, and governments understand that the Android market alleged herein is a discrete one, which Google monopolizes.

166.    In the alternative, the relevant market is a submarket of a larger market that includes, *inter alia*, Apple's App Store.

167.    Google's restraints on competition directly impact the U.S. market for Android OS distribution services as alleged herein. Google permits and encourages U.S. app developers to sell their apps via Google Play to non-U.S. nationals, and U.S. developers, including the Plaintiffs, do so. Upon information and belief, these developers' business relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S. entities. Therefore, the Foreign Trade Antitrust Improvement Act does not apply. Alternatively, its exceptions apply, including because the conduct alleged has a direct, substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations.

168.    Google is a direct seller of distribution services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[160]

---

[160] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020). The Google Play

169.    Plaintiffs seek relief on behalf of themselves and other developers. Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers. To the contrary, Google does not share its transaction fees with consumers. Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

### Second relevant market

170.    The antitrust injuries alleged herein, including harm to developers and competition, have occurred in the U.S. market for Android in-app payment processing for digital products, *i.e.*, for payment processing provided to U.S. Android app developers for these products.[161] Google has enormous power in this market, thanks to its willful and anticompetitive behavior as described in this complaint. As the European Commission has found, Google and Google Play, via various anticompetitive practices, have acquired some 90 percent of the market worldwide in Android app distribution.[162] And with few exceptions, Google requires the use of its in-app payment system for in-app product distributions. There, Google's share of the relevant market for Android in-app payment processing for digital products is believed, and therefore alleged, to have reached monopoly status.

171.    Competitors and would-be competitors in the relevant market exist, but their share is exceedingly small given Google's insistence that Android app developers use its own payment

---

mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

[161] *Cf.* "Antitrust: Commission fines Google €4.34 billion for illegal practices regarding Android mobile devices to strengthen dominance of Google's search engine," July 18, 2018, available at: http://europa.eu/rapid/press-release_IP-18-4581_en.htm ("Google is dominant in the worldwide market (excluding China) for app stores for the Android mobile operating system. Google's app store, the Play Store, accounts for more than 90% of apps downloaded on Android devices.").

[162] *See* n.158, *supra*.

processing system for digital products sold in apps acquired from Google Play. These competitors, such as PayPal, Stripe, and Square, charge many magnitudes less than Google,[163] and they provide better service, including quicker access to funds.[164] Google has "cut off the air supply" of each actual and potential competitor in the market for Android in-app payment processing by Google's abusive contracts, policies, and actions. And given the high sales and monetary value of in-app products,[165] certainly the effect on commerce in the market for these services is substantial.

172.   Again, due to Google's exclusionary contracts and policies, there is no substitute for Google's payment processing services. Developers, industries, and governments understand that the Android market alleged herein is a discrete one, which Google monopolizes.

173.   Based on the reasons alleged herein, including the foregoing, the relevant market is a single-brand market.

174.   Google's restraints on competition directly impact the U.S. market for Android in-app payment processing as alleged herein. Google permits and encourages U.S. app developers to sell their in-app products (in apps purchased in or via Google Play) to non-U.S. nationals, and U.S. developers (including Plaintiff Pure Sweat Basketball) do so. Upon information and belief, these developers' business relationship and dealings are primarily with Google LLC and Google Payment Corp., which are U.S. entities. Therefore, the Foreign Trade Antitrust Improvement Act does not apply. Alternatively, its exceptions apply, including because the conduct alleged has a direct,

---

[163] In fact, PayPal has a microtransactions program for sellers whose transactions average less than $10.  Where funds come from a PayPal account in the U.S., PayPal charges a fee of 5.0% of the transaction plus a fixed fee based on currency. *See* "Micropayment Fees," https://www.paypal.com/us/webapps/mpp/merchant-fees (last accessed Aug. 17, 2020).

[164] *Cf.* "Receiving Payout," available at: https://stripe.com/docs/payouts#payoutschedule (referring to two-business-day and seven-calendar-day payout schedule for U.S. accounts, depending on assessed risk level, for the payment processor Stripe) (last accessed Sept. 27, 2019).

[165] *See, e.g.*, *Consumer Spending in Mobile Apps Grew 17% in 2019 to Exceed $83 Billion Globally*, SensorTower (Jan. 6, 2020), https://sensortower.com/blog/app-revenue-and-downloads-2019 ("An estimated $61.7 billion was spent in mobile games across both stores last year, 12.8 percent more than 2018's total of $54.7 billion. This was 74 percent of all in-app spending for 2019[.]") (last accessed Aug. 17, 2020).

substantial, and reasonably foreseeable effect on trade or commerce which is not trade or commerce with foreign nations.

175.    Google is a direct seller of Android in-app payment processing services to Android developers for the sale of apps in or via the Google Play store and for add-ons and other products sold in those apps.[166]

176.    Plaintiffs seek relief on behalf of themselves and other developers. Insofar as Google Play may be or is a two-sided platform, lower prices would not lead to any discernible negative indirect network effects under the circumstances described herein. For example, unlike on credit-card transaction platforms, lower fees or prices would not mean less money available to pay rebates or rewards to consumers. To the contrary, Google does not share its transaction fees with consumers. Here, Google's restraints do not help to establish or enhance participation *inter se* developers and consumers, nor do they help to prevent erosion in participation. In fact, Google can point to no considerations that countervail the propriety of the monetary and injunctive relief that Plaintiffs seek.

## VIII.   CLASS ALLEGATIONS

177.    Plaintiffs bring this proposed class action for damages and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3).

178.    Plaintiffs bring this action on their own behalf and the following nationwide class, on the basis of federal law claims as alleged herein, or California state law claims as alleged herein, or both:

> All U.S. developers of: (a) any paid Android OS app sold in or via the Google Play store, in or via any U.S. or foreign Google Play storefront; or (b) any paid in-app product (including subscriptions) sold in the Google Play store, in or via any U.S. or foreign Google Play storefront, or via apps distributed in or via the Google Play store.

Excluded from this proposed class are the defendants; defendants' affiliates and subsidiaries; defendants' current or former employees, officers, directors, agents, and representatives; the district

---

[166] *See, e.g.*, https://play.google.com/store (offering various digital products to consumers for purchase, including apps, at various price points) (last accessed Aug. 15, 2020). The Google Play mobile client is installed on hundreds of millions of Android OS devices, as alleged herein, and similarly offers various products, including apps, for purchase and sale.

judge or magistrate judge to whom this case is assigned, as well as those judges' immediate family members; and all governmental entities.

179.    **Numerosity:** The exact number of the members of the proposed class is unknown and is not available to the Plaintiffs at this time, but upon information and belief, the class will consist of many thousands of members such that individual joinder in this case is impracticable.

180.    **Commonality:** Numerous questions of law and fact are common to the claims of the Plaintiffs and members of the proposed class. These include, but are not limited to:

a.      Whether Google unlawfully has conditioned the contractual right of any manufacturer of any Android OS mobile telephone or tablet to pre-install desired Google applications such as the YouTube or Google Maps apps on the manufacturer's agreement also to install the Google Play client, with the object of acquiring or maintaining monopoly status in the U.S. market for Android OS app distribution (and correspondingly high market shares in the markets for Android OS distribution services and in-app payment processing services);

b.      Whether there is a U.S. antitrust market (or submarket) for Android OS app distribution services, *i.e.*, for distribution services provided to U.S. Android app developers;

c.      Whether there is a U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers;

d.      Whether Google has unlawfully monopolized, or attempted to monopolize, the foregoing markets or submarket;

e.      Whether competition in the U.S. market for Android OS distribution services, or payment processing, has been restrained and harmed by Google's monopolization, or attempted monopolization, of such market(s);

f.      Whether Google has imposed contracts on developers that restrain trade as alleged herein;

g.      Whether developers have been harmed, including by way of having paid more for app transaction or distribution fees, or in-app product payment processing fees, than they would have but for Google's unlawful conduct, as a result of Google's unlawful practices;

h.      Whether Plaintiffs and members of the proposed class are entitled to declaratory or injunctive relief to halt Google's unlawful practices, and to their attorney fees, costs, and expenses;

i.      Whether Plaintiffs and members of the proposed class are entitled to any damages or restitution incidental to the declaratory or injunctive relief they seek, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief; and

j.      Whether Plaintiffs and members of the proposed class are otherwise entitled to any damages or restitution, and to their attorney fees, costs, and expenses related to any recovery of such monetary relief.

181.    **Typicality:** Plaintiffs' claims are typical of the claims of the members of the proposed class. The factual and legal bases of Google's liability are the same and resulted in injury to Plaintiffs and all of the other members of the proposed class.

182.    **Adequate representation:** Plaintiffs will represent and protect the interests of the proposed class both fairly and adequately. They have retained counsel competent and experienced in complex class-action litigation. Plaintiffs have no interests that are antagonistic to those of the proposed class, and their interests do not conflict with the interests of the proposed class members they seek to represent.

183.    **Prevention of inconsistent or varying adjudications:** If prosecution of myriad individual actions for the conduct complained of were undertaken, there likely would be inconsistent or varying results. This would have the effect of establishing incompatible standards of conduct for the Defendants. Certification of Plaintiffs' proposed class would prevent these undesirable outcomes.

184.    **Injunctive and declaratory relief:** By way of its conduct described in this complaint, the Defendants have acted on grounds that apply generally to the proposed class. Accordingly, final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

185.    **Predominance and superiority:** This proposed class action is appropriate for certification. Class proceedings on these facts and this law are superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. Even if members of the proposed class could sustain individual litigation, that course

would not be preferable to a class action because individual litigation would increase the delay and expense to the parties due to the complex factual and legal controversies present in this matter. Here, the class action device will present far fewer management difficulties, and it will provide the benefit of a single adjudication, economies of scale, and comprehensive supervision by this Court. Further, uniformity of decisions will be ensured.

## IX.   APPLICABILITY OF CALIFORNIA LAW

186.   There is a California law provision incorporated by reference in the Google Play Terms of Service.[167] Accordingly, Plaintiffs allege that California law applies to the state law claims they assert on their own behalf, and on behalf of the proposed nationwide class.

187.   Furthermore, upon information and belief, the unlawful conduct alleged in this complaint, including the drafting, dissemination, and consummation of anticompetitive contracts and policies, as well as the levying and collection of Google's supracompetitive 30% transaction fee on Google Play purchases, and the enforcement of minimum-price terms, was effected, implemented, adopted, and ratified in the state of California, where Google LLC and Google Payment Corp. maintain their U.S. headquarters. Therefore, a substantial part of the anticompetitive conduct took place in California. For these reasons, too, Plaintiffs allege that they and the proposed nationwide class are entitled to monetary and injunctive relief pursuant to California law.

**FIRST CAUSE OF ACTION:**
**VIOLATION OF THE SHERMAN ACT – MONOPOLIZATION**
**OF U.S. ANDROID APP DISTRIBUTION MARKET**
**(15 U.S.C. § 2)**

188.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

189.   Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

---

[167] *See* Google Play Terms of Service, available at: https://play.google.com/about/play-terms/index.html, which incorporates the Google Terms of Service, the latter of which is available at: https://policies.google.com/terms ("California law will govern all disputes arising out of or relating to these terms, service-specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts.").

190.    Google possesses monopoly power in the U.S. market for distribution of Android OS apps, *i.e.*, for distribution services provided to U.S. Android app developers. Alternatively, Google possesses monopoly power in the U.S. market for Android app distribution.

191.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

192.    Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

193.    Furthermore, in an exercise of its monopoly market power, and in order to willfully obtain, maintain, and enhance that power in the Android app distribution market, Google has tied in-app payment processing via its Google Pay Billing product to Android OS app distribution via Google Play. Google has done so via policy, practice, and contract as alleged herein. In-app payments to U.S. developers run to millions of dollars each year, on millions of transactions. Therefore, the effect on the tied market for in-app payment processing, as well as on the tying market for distribution services, is substantial. Accordingly, Google's tying conduct is *per se* unlawful. And alternatively, it is unlawful under a rule of reason analysis given the facts and circumstances described herein.

194.    Given this tie, Google's immense market power in the tying market for distribution services, and the substantial effect on commerce in the tied market for Android in-app payment processing, is *per se* unlawful.

195.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app distribution.

196.    Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the U.S. market for Android OS app distribution, with the effect being that competition is foreclosed and that developer choice is gravely diminished. So is innovation. Additionally, Google has abused

its market power by imposing supracompetitive 30% developer transaction fees[168] and minimum

price fixing. Further, Google's actions have depressed output as alleged herein.

197.    There is no valid business necessity or pro-competitive justification for Google's

conduct. Instead, Google's actions are designed to destroy competition as alleged herein.

198.    Plaintiffs and the class have been injured, and will continue to be injured, in their

businesses and property as a result of Google's conduct, including by way of overpaying for

distribution services.

199.    Finally, developers, including the Plaintiffs, are inclined to sell Android OS

applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the

future, in part because of their investment in their development for the Android OS ecosystem, which

is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to

prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its

behavior is causing to their businesses.

**SECOND CAUSE OF ACTION:**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION**
**OF U.S. ANDROID APP DISTRIBUTION MARKET**
**(15 U.S.C. § 2)**

200.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

201.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the

proposed nationwide class described above.

202.    Google has attempted to monopolize the U.S. market for distribution of Android OS

apps, *i.e.*, for distribution services provided to U.S. Android app developers. Alternatively, Google

has attempted to monopolize the U.S. market for Android OS app distribution.

203.    Google's anticompetitive conduct has created a dangerous probability that it will

achieve monopoly power in the U.S. market for Android OS app distribution.

---

[168] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what
amounts to payment processing services that could be purchased much cheaper from other providers
if Google permitted developers to use them.

204.   Google has a specific intent to achieve monopoly power in the U.S. market for Android OS app distribution.

205.   Google has the power to exclude competition in the U.S. market for Android OS app distribution, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

206.   Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android OS app distribution.

207.   Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android OS app distribution, with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Google has abused its market power by insisting on 30% transaction fees[169] and minimum price fixing. Further, Google's actions have depressed output as alleged herein.

208.   There is no valid business necessity or pro-competitive justification for Google's conduct.

209.   Plaintiffs and the class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for distribution services.

210.   Finally, developers, including Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

---

[169] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other providers if Google permitted developers to use them.

### THIRD CAUSE OF ACTION:
### VIOLATION OF THE SHERMAN ACT - MONOPOLIZATION OF U.S. MARKET
### FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES
### (15 U.S.C. § 2)

211.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

212.     Plaintiffs bring this federal law claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

213.     For this count, the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

214.     Google possesses monopoly power in the relevant market.

215.     For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant markets.

216.     Google has the power to exclude competition in the relevant market, and it has willfully used that power, including by way of its unlawful practices in restraint of trade as described herein, in order to achieve, maintain, and expand its monopoly power in that market.

217.     Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the relevant market is the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

218.     Google has behaved as alleged herein to achieve, maintain, and grow its monopoly in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers, with the effect being that competition is foreclosed and that developer choice is gravely diminished. So is innovation. Additionally, Google has abused its market power by imposing supracompetitive 30% developer transaction fees[170] and minimum price fixing. Further, Google's actions have depressed output as alleged herein.

219.     There is no valid business necessity or pro-competitive justification for Google's conduct. Instead, Google's actions are designed to destroy competition as alleged herein.

---

[170] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other providers if Google permitted developers to use them.

220.     Plaintiffs and the class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

221.     Finally, developers, including Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

**FOURTH CAUSE OF ACTION:**
**VIOLATION OF THE SHERMAN ACT – ATTEMPTED MONOPOLIZATION OF U.S.**
**MARKET FOR ANDROID IN-APP PAYMENT PROCESSING SERVICES**
**(15 U.S.C. § 2)**

222.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

223.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the proposed nationwide class described above.

224.     Google has attempted to monopolize the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

225.     Google's anticompetitive conduct has created a dangerous probability that it will achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

226.     Google has a specific intent to achieve monopoly power in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

227.     Google has the power to exclude competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers, and it has used that power, including by way of its unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

228.    Google's conduct as described herein, including its unlawful practices in restraint of trade, is exclusionary vis-à-vis its rivals in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

229.    Google has behaved as alleged herein in a willful attempt to obtain a monopoly in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers, with the effect being that competition is foreclosed and that consumer choice is gravely diminished. So is innovation. Additionally, Google has abused its market power by insisting on 30% transaction fees[171] and minimum price fixing. Further, Google's actions have depressed output as alleged herein.

230.    There is no valid business necessity or pro-competitive justification for Google's conduct.

231.    Plaintiffs and the class have been injured, and will continue to be injured, in their businesses and property as a result of Google's conduct, including by way of overpaying for payment processing services.

232.    Finally, developers, including Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment, including the harm that its behavior is causing to their businesses.

**FIFTH CAUSE OF ACTION:**
**VIOLATION OF THE SHERMAN ACT – RESTRAINT OF TRADE RE:**
**IN-APP PAYMENT PROCESSING**
**(15 U.S.C. §§ 1, 3)**

233.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

---

[171] Or, alternatively, a still supracompetitive 15% commission on certain subscriptions, for what amounts to payment processing services that could be purchased much cheaper from other providers if Google permitted developers to use them.

234.   Google's conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. §§ 1, 3.

235.   Google requires app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed through Google's monopolized app store, Google Play. The relevant provisions of these agreements unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

236.   Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through Google Play. This includes payments related to in-app purchases of digital content. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through Google Play "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

237.   Section 4.5 of the DDA prohibits developers from using Google Play to "distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires all developers to "adhere" to Google's Developer Program Policies. Under the heading "Device and Network Abuse," Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through Google Play,

even though there is no legitimate technological or other impediment to distributing a competing app store through Google Play.

238.     The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the U.S. market for Android app distribution and Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

239.     Google's conduct affects a substantial volume of interstate commerce.

240.     Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output

241.     Plaintiffs and putative class members have been harmed by Google's anticompetitive conduct in a manner that the antitrust laws were intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction issues that will stop Google's anticompetitive conduct.

242.     Developers, including the Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

**SIXTH CAUSE OF ACTION:**
**VIOLATION OF THE SHERMAN ACT – TYING AS ALTERNATIVE BASIS FOR**
**RESTRAINT OF TRADE RE: IN-APP PAYMENT-PROCESSING**
**(15 U.S.C. §§ 1, 3)**

243.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

244.     Google's conduct violates Sections 1 and 3 of the Sherman Act, which prohibit "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. . . ." 15 U.S.C. §§ 1, 3.

245.     Google has unlawfully tied distribution services for Google Play to its in-app payment processor, Google Play Billing, through its DDAs with app developers and its Developer Program Policies.

246.    As demonstrated herein, Google has immense, monopoly power in the tying market—the U.S. market for Android OS app distribution. Put another way, with Google Play installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed via Google Play, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supracompetitive taxes on the sale of apps via Google Play.

247.    The availability of Google Play for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing. Google's foreclosure of alternative app distribution channels thus forces developers, including the Plaintiffs and putative class members, to use Google's in-app payment processing services.

248.    The tying product, Android app distribution, is distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets. Google's contract and written policies underscore their separate nature.[172]

249.    Google's conduct forecloses competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers. Given the volume of transactions and the money at issue, Google's conduct thus affects a substantial volume of commerce in that market.

250.    Google has thus engaged in a *per se* illegal tying arrangement. *See* ¶¶ 155-157, *supra*.

251.    In the alternative only, even if Google's tying conduct does not constitute a *per se* violation of the law, a rule-of-reason analysis of Google's tying arrangement also would demonstrate that it violates the law.

252.    As app developers that consume in-app payment processing services for in-app subscription products, Plaintiffs have been harmed by Google's anticompetitive conduct. Plaintiffs and members of the putative class have suffered and continue to suffer damages and irreparable

---

[172] *See* supra ¶¶ 155-57.

1    injury, including ongoing harm to their businesses, and such damages and injury will not abate until

2    the Court issues an injunction ending Google's anticompetitive conduct issues

3        253.    Developers, including the Plaintiffs, are inclined to sell Android OS applications, in-

4    app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part

5    because of their investment in their development for the Android OS ecosystem, which is

6    incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to

7    prevent Google from persisting in its unlawful behavior to their detriment.

8                        **SEVENTH CAUSE OF ACTION:**
                    **VIOLATION OF THE UNFAIR COMPETITION ACT**
9                      **(CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)**

10       254.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

11       255.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the

12   proposed nationwide class described above.

13       256.    California's Unfair Competition Law (UCL) defines "unfair competition" to include

14   any "unlawful, unfair, or fraudulent" business act or practice. CAL. BUS. & PROF. CODE §§ 17200 *et*

15   *seq.* As these are stated in the disjunctive, the UCL sets up three prongs—the unlawful, unfair, and

16   fraudulent prongs—the violation of any of which constitutes a violation of the UCL

17       257.    Google has engaged in, and continues to engage in, acts of unfair competition as

18   defined in California's UCL. More specifically, Google, based upon the conduct alleged herein, has

19   violated the unlawful and unfair prongs of the UCL.

20       **Google's Conduct is Unlawful**

21       258.    Google's acts of unfair competition include its violations of the Sherman Act as

22   alleged herein. Therefore, Google has violated the unlawful prong of the UCL.

23       259.    Google's conduct has harmed developers, and developers have overpaid for

24   distribution and in-app payment processing fees, due to Google's unlawful behavior as alleged

25   herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees

26   on developers. But for Google's exclusionary and anticompetitive behavior, developer charges

27   would have been much lower than what they were.

28

**Google Has Behaved Unfairly**

260.    Google's acts of unfair competition include its violations of the Sherman Act and the policies underlying it, as alleged herein. Additionally, Google has behaved unfairly and in violation of public policy as alleged herein. Therefore, Google has violated the unfair prong of the UCL.

261.    Google's conduct has harmed developers, and developers have overpaid for distribution and in-app payment processing fees, due to Google's unfair behavior as alleged herein. Google's willfully obtained market power has allowed it to impose its supracompetitive fees on developers. But for Google's exclusionary and anticompetitive behavior, developer payments would have been much lower than what they were.

262.    Finally, developers, including the Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

**EIGHTH CAUSE OF ACTION:**
**VIOLATION OF THE CARTWRIGHT ACT**
**(CA. BUS & PROF. CODE §§ 16700 *ET SEQ.*)**

263.    Plaintiffs repeat and re-allege every allegation above as set forth herein in full.

264.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia,* the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

265.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

266.    The U.S. market for distribution of Android OS apps, *i.e.*, for distribution services provided to U.S. Android app developers, is a valid antitrust market. Alternatively, the Android app distribution market is a valid antitrust market.

267.    Google requires app developers to enter its standardized DDA, including Developer Program Policies integrated into that Agreement, as a condition of having their apps distributed

through Google's monopolized app store, Google Play. The relevant provisions of these agreements unreasonably restrain competition in the U.S. market for Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

268.     Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through Google Play. This includes payments related to in-app purchases of digital content. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through Google Play "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for such in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly applies its anticompetitive mandate to every "game downloaded on Google Play" and to all purchased "game content."

269.     Section 4.5 of the DDA prohibits developers from using Google Play to "distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." Section 4.1 of the DDA requires all developers to "adhere" to Google's Developer Program Policies. Under the heading "Device and Network Abuse," Google prohibits developers from distributing apps that "download executable code [*i.e.*, code that would execute an app] from a source other than Google Play." The DDA further reserves to Google the right to remove and disable any Android app that it determines violates either the DDA or its Developer Program Policies and to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from offering competing app stores through Google Play, even though there is no legitimate technological or other impediment to distributing a competing app store through Google Play.

270.     The challenged provisions serve no sufficient legitimate or pro-competitive purpose and unreasonably restrain competition in the U.S. market for Android app distribution and Android in-app payment processing, *i.e.*, for payment processing provided to U.S. Android app developers.

271.    Google's conduct has substantial anticompetitive effects, including increased prices and costs, reduced innovation and quality of service, and lowered output.

272.    Plaintiffs and putative class members have been harmed by Google's anticompetitive conduct in a manner that the Cartwright Act was intended to prevent. They have suffered and continue to suffer damages and irreparable injury, including harm to their businesses, and such damages and injury will not abate unless an injunction issues that will stop Google's anticompetitive conduct.

273.    Developers, including the Plaintiffs, are inclined to sell Android OS applications, in-app purchases, and subscriptions via Google Play, or apps purchased therein, in the future, in part because of their investment in their development for the Android OS ecosystem, which is incompatible with Apple's iOS ecosystem. Plaintiffs and the class are entitled to an injunction to prevent Google from persisting in its unlawful behavior to their detriment.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    That the Court certify this case as a class action and that it appoint Plaintiffs as class representatives and their counsel as class counsel;

B.    That the Court award them and the proposed class all appropriate relief, to include, but not be limited to, injunctive relief requiring that Google cease the abusive, unlawful, and anticompetitive practices described herein (including pursuant to federal antitrust law, *see, e.g.*, 15 U.S.C. § 26, and state law, *see, e.g.*, Cal. Bus. & Prof. Code §§ 16750 and 17203, as requested herein); declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution (*see, e.g.*, Cal. Bus. & Prof. Code § 17203) or damages, including treble damages (*see, e.g.*, 15 U.S.C. § 15(a), and Cal. Bus. & Prof. Code § 16750), or other multiple or punitive damages, or restitution, where mandated by law (including federal antitrust law, *see, e.g.*, 15 U.S.C. § 15(a)) or equity or as otherwise available; together with recovery of their costs of suit, to include their reasonable attorneys' fees, costs, and expenses (including pursuant to federal and state antitrust law, *see, e.g.*, 15 U.S.C. § 15(a) and/or 15 U.S.C. § 26 and Cal. Bus. & Prof. Code § 16750; *see also*

Cal. Code Civ. Pro. § 1021.5)), together with pre- and post-judgment interest to the maximum levels permitted by law or equity.

   C.      That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

   D.      That the Court award Plaintiffs and the proposed class such other, favorable relief as may be available and appropriate under federal or state law, or at equity.

**JURY TRIAL DEMANDED**

   Plaintiffs demand a trial by jury on all issues so triable.


DATED: October 21, 2020                    Respectfully submitted,

                                            HAGENS BERMAN SOBOL SHAPIRO LLP


                                            By  ___*/s/ Steve W. Berman*___
                                            Steve W. Berman (*pro hac vice*)
                                            Robert F. Lopez (*pro hac vice*)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            1301 Second Avenue, Suite 2000
                                            Seattle, WA  98101
                                            Telephone: (206) 623-7292
                                            Facsimile:  (206) 623-0594
                                            steve@hbsslaw.com
                                            robl@hbsslaw.com

                                            Benjamin J. Siegel (SBN 256260)
                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                            715 Hearst Avenue, Suite 202
                                            Berkeley, CA 94710
                                            Telephone: (510) 725-3000
                                            Facsimile:  (510) 725-3001
                                            bens@hbsslaw.com

By ____/s/ Eamon P. Kelly_____
Eamon P. Kelly (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Alberto Rodriguez (*pro hac vice forthcoming*)
SPERLING & SLATER, P.C.
55 W. Monroe Street, 32nd Floor
Chicago, IL 60603
Telephone: (312) 676-5845
Facsimile:  (312) 641-6492
jvanek@sperling-law.com
ekelly@sperling-law.com
arodriguez@sperling-law.com


*s/ Bonny E. Sweeney*_____
Bonny E. Sweeney (SBN 176174)
Samantha J. Stein (SBN 302034)
**HAUSFELD LLP**
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Telephone.: (415) 633-1908 (main)
Telephone: (415) 633-1953 (direct)
Facsimile:  (415) 358-4980
bsweeney@hausfeld.com
sstein@hausfeld.com


Melinda R. Coolidge (*pro hac vice forthcoming*)
**HAUSFELD LLP**
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200 (main)
Telephone: (202) 540-7144 (direct)
Facsimile:  (202) 540-7201
mcoolidge@hausfeld.com


Katie R. Beran (*pro hac vice forthcoming*)
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 985-3270 (main)
Telephone: (267) 702-3215 (direct)
Facsimile:  (215) 985-3271
kberan@hausfeld.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Scott A. Martin (*pro hac vice forthcoming*)
Irving Scher (*pro hac vice forthcoming*)
**HAUSFELD LLP**
33 Whitehall Street, 14th Floor
New York, NY 10004
Telephone: (646) 357-1100 (main)
Telephone: (646) 357-1195 (direct)
Facsimile:  (212) 202-4322
smartin@hausfeld.com

Michael Lewis (*pro hac vice pending*)
**The Lewis Firm PLLC**
1300 I Street NW, Suite 400E
Washington, DC 20005
Tel.: (202) 355-8895
Fax: (888) 430-6695
mlewis@lewis-firm.com

*Attorneys for Plaintiffs and the Proposed Class*